[No. S104444. June 9, 2003.]

BRENT FERGUSON et al., Plaintiffs and Appellants, v.
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, et al., Defendants
and Respondents.

1038

## COUNSEL

Adams • Nye • Sinunu • Walker, David J. Becht, Bruce Nye and Ross L. Libenson for Plaintiffs and Appellants.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Ethan P. Schulman and Deborah A. Kane for Defendants and Respondents.

Bird, Marella, Boxer & Wolpert and Thomas R. Freeman for Los Angeles County Bar Association, Orange County Bar Association and Beverly Hills Bar Association as Amici Curiae on behalf of Defendants and Respondents.

Greines, Martin, Stein & Richland and Robert A. Olson for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendants and Respondents.

Lewis Brisbois Bisgaard & Smith, Richard B. Wolf and Raul L. Martinez for Lawyers Mutual Insurance Company, Continental Casualty Company, Carolina Casualty Insurance Company and Admiral Insurance Company as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BROWN, J.**—In a mass tort action, class counsel stipulated to the certification of a mandatory, non-opt-out class with respect to punitive damages.

To settle the action, class counsel agreed to dismiss the punitive damages class claims with prejudice. Despite objections from some class members, the trial court dismissed the punitive damages claims and approved the settlement. Two of these objectors now contend class counsel committed legal malpractice and seek to recover the punitive damages they would have recovered but for counsel's negligence. We now consider whether plaintiffs in a legal malpractice action may recover as compensatory damages the punitive damages they allegedly lost due to the negligence of their attorneys in the underlying litigation (lost punitive damages). We conclude they may not.

FACTS

## A.   *The Underlying Class Action*

In 1994, a processing tower at a refinery in Rodeo, California, released hydrogen sulfide and a toxic chemical called Catacarb into the atmosphere. The release of these substances affected thousands of residents living near the refinery.

Soon thereafter, respondent Lieff, Cabraser, Heimann & Bernstein, LLP (Lieff Cabraser), filed a class action lawsuit against Union Oil Company of California (Unocal), the owner of the refinery. The complaint sought, among other things, punitive damages. Other law firms also filed individual and class action lawsuits against Unocal—including Casper, Meadows & Schwartz (Casper Meadows), which had entered into contingent fee contracts with and filed suit on behalf of appellants Brent Ferguson and Florencia Prieto (collectively appellants) and other individuals.

Pursuant to a pretrial order, the trial court consolidated these actions against Unocal and designated them as complex litigation. The court gave primary responsibility for managing the consolidated actions to a steering committee of plaintiffs' counsel—which included Lieff Cabraser and Casper Meadows. The court designated Lieff Cabraser as co-lead class counsel and Casper Meadows as co-lead direct action counsel.

Lieff Cabraser then filed a first amended model complaint identifying four potential classes: (1) personal injury, (2) property damage, (3) medical monitoring, and (4) punitive damages (Unocal Class Action). Several months later, Lieff Cabraser, its co-lead class counsel, and Unocal entered into a stipulation and order approved by the trial court. Under the stipulation and order, the class action plaintiffs agreed to withdraw the allegations of the personal injury and property damage classes. The parties also stipulated to

the "certification of a mandatory, non-opt-out" punitive damages class and agreed to schedule the issue of certification of the medical monitoring class for briefing and decision. Finally, the stipulation and order gave individuals with claims for personal injury or property damage 60 days to file their claims and gave plaintiffs the right to seek certification of the personal injury and property damage classes if Unocal moved to decertify or substantially modify the punitive damages class.

Following extensive discovery, Lieff Cabraser engaged in settlement negotiations with Unocal under the aegis of Retired Judge Daniel H. Weinstein, the court-appointed settlement master. After "extensive negotiations and discussion," the parties tentatively agreed to an $80 million global settlement of the consolidated class and individual actions. The settlement required the dismissal of the punitive damages class claims with prejudice.

The parties then stipulated to an order referring all issues concerning the good faith and scope of the settlement and the allocation of settlement proceeds to Judge Weinstein. Pursuant to this order, Judge Weinstein reported that the settlement negotiations "were conducted at arm's length by highly qualified counsel who were thoroughly knowledgeable about the evidence and the law." He further concluded that the $80 million settlement was "a fair, reasonable, and just settlement for all of the settling parties." Observing that the settlement "could not have been achieved without Class Counsel's agreement to dismiss with prejudice the punitive damages allegations of the non-opt-out punitive damages class" and finding "the handful of objections to the proposed dismissal . . . to be unpersuasive," Judge Weinstein recommended "that the Court grant Class Counsel's motion to dismiss the punitive damages class claims with prejudice."

After providing notice of the proposed dismissal of the punitive damages class claims, Lieff Cabraser filed the motion to dismiss. The motion included authorizations from the various attorneys representing the individual plaintiffs—including Casper Meadows—to dismiss their clients' claims in exchange for participation in the $80 million global settlement.

Over 12,000 individual members of the punitive damages class received notice of the motion; eight, including appellants, filed objections. Appellants focused on the purported inadequacy and unfairness of the settlement and asked the court to allocate the $80 million settlement solely to the punitive damages claims. Ferguson himself attended the hearing on the motion and personally voiced his objections to the court. Appellants proceeded in propria persona because Casper Meadows refused to represent them in

opposing the motion and settlement and because they could not find another attorney to assist them.

At the hearing, the trial court approved the settlement and dismissed the punitive damages class claims with prejudice. In doing so, the court stated: "I'm . . . satisfied that those concerns that you [the objectors] have [have] been fully considered by the class counsel that are proposing this settlement. And I'm satisfied that this appears to be a fair and reasonable settlement for all parties involved. . . . [¶] My understanding of the settlement . . . [is] that the $80 million settlement does encompass all punitive damages claims that have been filed, and I'm hearing from everyone that I have a great deal of confidence in that this is a settlement that should be approved and that the dismissal of the punitive claims would be appropriate."

In its written order dismissing the punitive damages class claims, the court concluded "that the public's interest in punishing Unocal for its conduct" at its Rodeo "refinery, and in deterring Unocal from future such conduct has been achieved." The court also issued an order finding that the settlement "is fair, reasonable and made in good faith, as that term is used in Code of Civil Procedure Section 877.6."

Appellants did not appeal the dismissal of the punitive damages claims. Instead, represented by Casper Meadows, they participated in the claims process created by the settlement. Ferguson received an award of $125,000 and Prieto received an award of $100,000 from the $80 million settlement. Neither Ferguson nor Prieto appealed or otherwise challenged these awards.

B. *The Legal Malpractice Action*

A few weeks after receiving the settlement awards, appellants filed the instant action against, among others, Lieff Cabraser and the individual attorneys at Lieff Cabraser involved in the settlement of the Unocal Class Action—respondents William Bernstein, Donald C. Arbitblit, and Jonathan D. Selbin (collectively respondents). After initial demurrer rulings by the trial court,[1] appellants filed a third amended complaint. The complaint stated 11 causes of action, including: (1) negligence, (2) legal malpractice, (3) breach of fiduciary duty, (4) fiduciary fraud, (5) intentional fraud, (6) breach of contract, (7) constructive fraud, (8) breach of the implied covenant of good faith and fair dealing, (9) conspiracy to commit fraud, and (10) unjust

---

[1] In their demurrer to the initial complaint, respondents contended appellants could not recover lost punitive damages. In ruling on the demurrer, the trial court apparently rejected this contention.

enrichment. The gist of the complaint was that the settlement and related notices were inadequate and that respondents breached their fiduciary duty and committed malpractice by certifying the non-opt-out punitive damages class, negotiating and recommending the settlement, and refusing to support appellants' objections to the settlement. As compensatory damages, appellants alleged they lost a potential award of punitive damages against Unocal and received an award of compensatory damages far below the amount they would have received but for respondents' tortious conduct.

The trial court initially sustained respondents' demurrers to the fraud-related causes of action. The court later granted summary judgment for respondents on appellants' remaining claims because the undisputed evidence established that these claims were "barred by the doctrine of collateral estoppel." The court also found no due process violation because appellants received adequate notice of the proceedings in the Unocal Class Action. Finally, the court barred appellants' unjust enrichment claim because respondents received no benefit at appellants' expense. Pursuant to these findings, the court entered judgment in favor of respondents.

The Court of Appeal affirmed. The court found that the trial court properly sustained the demurrers to appellants' fraud-related causes of action because "knowledge of all relevant events and notices by [Casper Meadows] was imputed to them." The court then upheld the summary judgment because appellants could recover no damages from respondents as a matter of law. First, the court held that appellants, by participating in the claims process, waived their claims of inadequate compensatory damages. Second, the court held that "as a matter of law, lost punitive damages are not recoverable as compensatory damages for legal malpractice." Because the court found no cognizable damages, it did not address any other issues.

We granted review solely to determine whether lost punitive damages are recoverable in a legal malpractice action and conclude they are not.

### DISCUSSION

Citing *Merenda v. Superior Court* (1992) 3 Cal.App.4th 1, 14 [4 Cal.Rptr.2d 87], appellants contend they merely "seek[] the value of the recovery [they] lost through [respondents'] negligence"—i.e., the punitive damages they should have recovered from Unocal. Because these lost punitive damages "are compensatory, not punitive," in the context of a legal malpractice action (*ibid.*), they contend they may recover these damages even though respondents did not act oppressively, fraudulently, or maliciously (see Civ. Code, § 3294, subd. (a)). Respondents counter that appellants may not recover lost punitive damages as compensatory damages for

attorney negligence under the reasoning of *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953 [105 Cal.Rptr.2d 88]. According to respondents, allowing recovery of lost punitive damages contravenes the purpose of punitive damages awards and cannot be justified "as a matter of policy." (*Id.* at pp. 981-982.) We agree with respondents, and find that legal malpractice plaintiffs may not recover lost punitive damages as compensatory damages.

■ "Detriment is a loss or harm suffered in person or property." (Civ. Code, § 3282.) "For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment *proximately caused* thereby, whether it could have been anticipated or not." (Civ. Code, § 3333, italics added.) Thus, "an attorney's 'liability, as in other negligence cases, is for all damages directly and proximately caused by his negligence.'" (*Smith v. Lewis* (1975) 13 Cal.3d 349, 362 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231], overruled on another point in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, fn. 14 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164], quoting *Pete v. Henderson* (1954) 124 Cal.App.2d 487, 489 [269 P.2d 78, 45 A.L.R.2d 58].)

"Proximate cause involves *two* elements." (*PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 315 [84 Cal.Rptr.2d 455, 975 P.2d 652] (*PPG*).) "One is *cause in fact*. An act is a cause in fact if it is a necessary antecedent of an event." (*Ibid.*) "Whether defendant's negligence was a cause in fact of plaintiff's damage . . . is a factual question for the jury to resolve." (*Smith v. Lewis, supra,* 13 Cal.3d at p. 360, fn. 9.)

By contrast, the second element focuses on public policy considerations. Because the purported causes of an event may be traced back to the dawn of humanity, the law has imposed additional "limitations on liability other than simple causality." (*PPG, supra,* 20 Cal.4th at pp. 315-316.) "These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy." (*Id.* at p. 316.) Thus, "proximate cause 'is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.'" (*Ibid.*, quoting *Mosley v. Arden Farms Co.* (1945) 26 Cal.2d 213, 221 [157 P.2d 372, 158 A.L.R. 872] (conc. opn. of Traynor, J.).)

■ Applying this understanding of proximate causation in the punitive damages context, we recently refused to hold a negligent insurer liable for punitive damages assessed against its insured. In *PPG,* an insurer refused to settle an action against its insured for an amount within the insured's policy

limits. As a result, the insured suffered a judgment for $1 million in punitive damages. (*PPG, supra,* 20 Cal.4th at p. 313.) The insured sued its insurer for breach of the covenant of good faith and fair dealing and sought to recover as compensatory damages the $1 million "it had been ordered to pay as punitive damages . . . ." (*Id.* at p. 314.) The trial court granted summary judgment for the insurer, and the Court of Appeal affirmed. (*Ibid.*)

We agreed. Although the insurer's negligence was the cause in fact of the punitive damages award (*PPG, supra,* 20 Cal.4th at p. 315), we nonetheless concluded that the insurer's negligence did not proximately cause the award (*id.* at p. 316). In reaching this conclusion, we held that "three policy considerations" "strongly militate against allowing the insured, the morally culpable wrongdoer in the third party lawsuit, to shift to its insurance company the obligation to pay punitive damages resulting from the insured's egregious misconduct in that lawsuit." (*Ibid.,* fn. omitted.) First, allowing the insured to shift to its insurer "its responsibility to pay the punitive damages in the third party action would violate the public policy against reducing or offsetting liability for intentional wrongdoing by the negligence of another." (*Id.* at p. 317.) Second, allowing the insurer to assume liability for punitive damages premised on the egregious conduct of its insured would defeat the public policies underlying these damages. (*Ibid.*) Finally, requiring the insurer to pay punitive damages incurred by its insured would violate "the public policy against indemnification for punitive damages." (*Id.* at p. 318, fn. omitted.)

■■■ Applying a similar analysis, we conclude that public policy considerations strongly militate against allowing a plaintiff to recover lost punitive damages as compensatory damages in a legal malpractice action. First, allowing recovery of lost punitive damages would defeat the very purpose behind such damages. ■■■ "Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct." (*Newport v. Fact Concerts, Inc.* (1981) 453 U.S. 247, 266-267 [101 S.Ct. 2748, 2759, 69 L.Ed.2d 616] (*Newport*); see also Civ. Code, § 3294, subd. (a) [punitive damages are "damages for the sake of example and by way of punishing the defendant"].) "That purpose is a purely *public* one." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348].) "The essential question therefore in every case must be whether the amount of [punitive] damages awarded substantially serves the societal interest." (*Ibid.*)

■■■ Making a negligent attorney liable for lost punitive damages would not serve a societal interest, because the attorney did not commit and had no

control over the intentional misconduct justifying the punitive damages award. Imposing liability for lost punitive damages on negligent attorneys would therefore neither punish the culpable tortfeasor (see *Newport, supra,* 453 U.S. at p. 267 [101 S.Ct. at p. 2760] ["Under ordinary principles of retribution, it is the wrongdoer himself who is made to suffer for his unlawful conduct"]), nor deter that tortfeasor and others from committing similar wrongful acts in the future (see *Cappetta v. Lippman* (S.D.N.Y. 1996) 913 F.Supp. 302, 306). Indeed, allowing appellants to recover lost punitive damages would not effectuate the public purpose behind such damages in this case because, as the trial court in the Unocal Class Action found, "the public's interest in punishing Unocal . . . and in deterring Unocal from future such conduct has been achieved" by the $80 million settlement. (See *ante,* at p. 1043.)

Allowing recovery of lost punitive damages as compensatory damages in legal malpractice actions would also violate public policy, because the amount of the award bears no relation to the gravity of the attorney's misconduct or his or her wealth. A plaintiff seeking to recover lost punitive damages from his negligent attorney is "deliberately seeking an award disproportionate (or at least unrelated) to the [attorney's] ability to pay. That result . . . is contrary to the public purpose of punitive damages." (*Adams v. Murakami, supra,* 54 Cal.3d at p. 122.)

Contrary to appellants' assertion, awarding lost punitive damages would not indirectly further the deterrent purpose of punitive damages by encouraging attorneys "to exercise reasonable care in investigating or defending punitive damages claims." (*Jacobsen v. Oliver* (D.D.C. 2002) 201 F.Supp.2d 93, 102.) " ' "The policy considerations in a state where, as in [California], punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest *ultimately* as well as *nominally* on the party actually responsible for the wrong." ' " (*Peterson v. Superior Court* (1982) 31 Cal.3d 147, 157, fn. 4 [181 Cal.Rptr. 784, 642 P.2d 1305], italics added.) By ultimately and nominally imposing damages on an attorney, purporting to punish and deter a wrongdoer who was not responsible for the wrong, an award of lost punitive damages necessarily frustrates the purpose of such damages.

Even assuming an award of lost punitive damages may have some indirect deterrent effect, it still conflicts with the public purpose behind punitive damages. ■■■ "The ultimately proper level of punitive damages is an amount not so low that the defendant can absorb it with little or no discomfort [citation], nor so high that it destroys, annihilates, or cripples the

defendant." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 621-622 [103 Cal.Rptr.2d 492].) Thus, an award of lost punitive damages can only further the goal of deterrence if it deters "without being excessive." (*Adams v. Murakami, supra,* 54 Cal.3d at p. 111.) ■ Because an award of lost punitive damages bears no relation to the gravity of the attorney's misconduct or his or her wealth, it cannot further the deterrent purpose behind such damages. Indeed, where, as here, the intentional wrongdoer is a wealthy corporation whose alleged misconduct was especially reprehensible, any award of lost punitive damages is likely to be "disproportionate to the [attorney's] ability to pay" (*id.* at p. 112) and may financially destroy the attorney. Such a result would undoubtedly contravene the purpose of punitive damages, which "is to deter, not destroy." (*Ibid.*)

Second, permitting recovery of lost punitive damages would violate the public policy against speculative damages. ■ "[D]amages may not be based upon sheer speculation or surmise, and the mere possibility or even probability that damage will result from wrongful conduct does not render it actionable." (*In re Easterbrook* (1988) 200 Cal.App.3d 1541, 1544 [244 Cal.Rptr. 652], disapproved on other grounds by *People v. Romero* (1994) 8 Cal.4th 728, 744, fn. 10 [35 Cal.Rptr.2d 270, 883 P.2d 388].) "Damage to be subject to a proper award must be such as follows the act complained of as a legal certainty . . . ." (*Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768 [343 P.2d 118].)

■ Because an award of punitive damages constitutes a moral determination, lost punitive damages are too speculative to support a cause of action for attorney negligence. ■ In determining compensatory damages in a legal malpractice action, " 'the jury's task is to determine what a reasonable judge or fact finder would have done' " in the underlying action absent attorney negligence. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 840 [60 Cal.Rptr.2d 780], quoting *Brust v. Newton* (1993) 70 Wash.App. 2868 [52 P.2d 1092, 1095].) The standard is "an *objective* one." (*Mattco Forge,* at p. 840.) ■ Lost punitive damages, however, are not amenable to an objective determination. " 'Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, [citation], the level of punitive damages is not really a "fact" "tried" by the jury.' " (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 437 [121 S.Ct. 1678, 1686, 149 L.Ed.2d 674], quoting *Gasperini v. Center for Humanities, Inc.* (1996) 518 U.S. 415, 459 [116 S.Ct. 2211, 2235, 135 L.Ed.2d 659] (dis. opn. of Scalia, J.).) ■ Instead, a jury's "imposition of punitive damages is an expression of its moral condemnation." (*Cooper Industries,* at p. 432 [121 S.Ct. at p. 1683].) Indeed, a

plaintiff is not " '*entitled*, as of right' " to an award of punitive damages (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713] (*Brewer*)), even if the jury finds the defendant "guilty of oppression, fraud, or malice" (Civ. Code, § 3294, subd. (a)). ▉ Thus, to award lost punitive damages, the trier of fact must determine what *moral* judgment would have been made by a reasonable jury. Because moral judgments are inherently subjective, a jury cannot objectively determine whether punitive damages should have been awarded or the proper amount of those damages with any legal certainty. (See Rest.3d Law Governing Lawyers, § 53, com. h, p. 393 [an award of lost punitive damages "calls for a speculative reconstruction of a hypothetical jury's reaction"].) Lost punitive damages are therefore too speculative to support a cause of action for legal malpractice. (See *In re Easterbrook, supra*, 200 Cal.App.3d at p. 1544; *Agnew v. Parks, supra*, 172 Cal.App.2d at p. 768.)

Third, the complex standard of proof applicable to claims for lost punitive damages militates against the recovery of such damages. Because the standards of proof governing compensatory and punitive damages are different (compare Evid. Code, § 115 ["Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence"] with Civ. Code, § 3294, subd. (a) [plaintiff may recover punitive damages only "where it is proven by *clear and convincing evidence* that the defendant has been guilty of oppression, fraud, or malice" (italics added)]), the standard of proof for lost punitive damages will be, in essence, a standard within a standard. To recover lost punitive damages, a plaintiff must prove *by a preponderance of the evidence* that but for attorney negligence the jury would have found *clear and convincing evidence* of oppression, fraud or malice. In light of this complex standard, "[t]he mental gymnastics required to reach an intelligent verdict would be difficult to comprehend much less execute." (*Wiley v. County of San Diego* (1998) 19 Cal.4th 532, 544 [79 Cal.Rptr.2d 672, 966 P.2d 983] (*Wiley*).) This pragmatic difficulty provides additional support for barring recovery of lost punitive damages in a legal malpractice action. (See *ibid.*)

Fourth, allowing recovery of lost punitive damages in this case would hinder the ability of trial courts to manage and resolve mass tort actions by discouraging the use of mandatory, non-opt-out punitive damages classes. "[C]ourts have encouraged the use of mandatory class actions to handle punitive damages claims in mass tort cases. Mandatory class actions avoid the unfairness that results when a few plaintiffs—those who win the race to the courthouse—bankrupt a defendant early in the litigation process. They

also avoid the possible unfairness of punishing a defendant over and over again for the same tortious conduct." (*In re Exxon Valdez* (9th Cir. 2000) 229 F.3d 790, 795-796.) Making class counsel liable for lost punitive damages would, however, discourage counsel from using these mandatory classes because counsel would otherwise face the specter of multiple legal malpractice lawsuits from disgruntled class members.

Indeed, allowing lost punitive damages may adversely impact the overall ability of courts to manage their caseloads by making settlement more difficult in cases involving punitive damages claims. Because dissatisfied clients may seek such damages based solely on an allegation of negligent undervaluation of the punitive damages claims, the settlement of such claims exposes plaintiffs' attorneys to potentially devastating liability. Faced with this risk, plaintiffs' attorneys will likely be more hesitant to settle and more intransigent in their settlement demands.

Finally, allowing recovery of lost punitive damages as compensatory damages in a legal malpractice action may exact a significant social cost. Exposing attorneys to such liability would likely increase the cost of malpractice insurance, cause insurers to exclude coverage for these damages, or further discourage insurers from providing professional liability insurance in California. (See Ahern, *What's a Firm to Do?*, S.F. Recorder (Dec. 18, 2002) p. 4 ["This past year, California saw the departure of nine insurance companies that provide professional liability insurance to attorneys"].) The resulting financial burden on attorneys would probably make it more difficult for consumers to obtain legal services or obtain recovery for legal malpractice. At a minimum, the specter of lost punitive damages would encourage the practice of " 'defensive' law." (*Wiley, supra,* 19 Cal.4th at p. 544.) " '[I]n our already overburdened system it behooves no one to encourage the additional expenditure [of] resources merely to build a record against a potential malpractice claim.' " (*Id.* at pp. 544-545, quoting *Bailey v. Tucker* (1993) 533 Pa. 237 [621 A.2d 108, 114].) Even though respondents and amici curiae provide no concrete evidence that this parade of horribles will occur, "we deem it unwise to inflict the risk" "[a]bsent a compelling reason" to do so. (*Newport, supra,* 453 U.S. at p. 271 [101 S.Ct. at p. 2762].)

And appellants offer no compelling reason to take this risk. The general rule that "the measure of damages [in a legal malpractice action] is the value of the claim lost" does not preclude us from barring recovery of lost punitive damages for public policy reasons. (*Smith v. Lewis, supra,* 13 Cal.3d at p. 361.) A plaintiff in a legal malpractice action "is entitled only to be made

whole." (*Ibid.*) But "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages . . . ." (*State Farm Mutual Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, __ [123 S.Ct. 1513, 1521, 155 L.Ed.2d 585]; see also *Adams v. Murakami, supra,* 54 Cal.3d at p. 120 ["Whatever his or her injury, a plaintiff will be made whole by the award of compensatory damages"].) Thus, "[b]y definition [punitive damages] are not intended to make the plaintiff whole by compensating for a loss suffered." (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179].) "An award of punitive damages, though perhaps justified for societal reasons of deterrence, is a boon for the plaintiff. 'Such damages constitute a windfall . . . .' " (*Adams,* at p. 120.) Although the plaintiff is " 'entitled [as] of right to compensatory damages,' " he or she is " 'never entitled to' " punitive damages. (*Brewer, supra,* 32 Cal.2d at p. 801; *Davis v. Hearst* (1911) 160 Cal. 143, 173 [116 P. 530].) Because legal malpractice plaintiffs are made whole for their injuries by an award of lost compensatory damages, allowing these plaintiffs to recover lost punitive damages would give them an undeserved windfall. This is especially true where, as here, the plaintiffs have been fully compensated for their injuries.

The fear that insulating negligent attorneys from liability for lost punitive damages will foster misconduct is also overblown. Given the potential size of punitive damage awards and the typical contingent fee arrangements, attorneys already have a strong incentive to properly pursue these claims without subjecting them to liability for lost punitive damages. Moreover, in most cases, potential liability for lost compensatory damages—which are often substantial—provides an adequate deterrent to attorney misconduct. Finally, the specter of disciplinary action, increases in malpractice premiums, and losses in future business gives attorneys more than enough incentive to handle their cases properly. In any event, we believe the overwhelming public policy considerations militating against recovery of lost punitive damages significantly outweigh any countervailing risk of encouraging attorney negligence.

■ Neither *Granquist v. Sandberg* (1990) 219 Cal.App.3d 181 [268 Cal.Rptr. 109] nor *Norton v. Superior Court* (1994) 24 Cal.App.4th 1750 [30 Cal.Rptr.2d 217] (*Norton*) dictates a contrary result. In *Granquist,* the Court of Appeal held that the personal representative of a deceased tort victim may recover pain, suffering, or disfigurement damages in a legal malpractice action. (*Granquist,* at p. 185.) Concluding that former Probate Code section 573, subdivision (c)—limiting recovery by a personal representative "to the

loss or damage the decedent sustained or incurred prior to death"—did not apply, the court found no reason to deviate from the general rule that the measure of damages in a legal malpractice action is the value of the claim lost (*Granquist,* at pp. 186-187). By contrast, strong public policy considerations militate against allowing recovery of lost punitive damages. (See *ante,* at pp. 1046-1050.)

■ *Norton* is also inapposite. In *Norton,* the Court of Appeal held that the collateral source rule applied in legal malpractice actions as a matter of "practicality." (*Norton, supra,* 24 Cal.App.4th at p. 1758.) According to the court, "the defendant attorney stands in the shoes of the underlying tortfeasor insofar as the collateral source rule is concerned." (*Ibid.*) The court carefully limited its holding to the collateral source rule and did not address the question of proximate causation. Indeed, the court apparently found that no public policy barred the application of the collateral source rule. (See *ibid.*) That is not true here. (See *ante,* at pp. 1046-1050.) Finally, the court concluded that "[t]he result . . . in this case merely allows the plaintiffs in a legal malpractice action to be made whole." (*Norton,* at p. 1759.) By contrast, an award of lost punitive damages gives appellants a windfall that they were not entitled to in the underlying action. (See *ante,* at pp. 1050-1051.)

■ Finally, we decline to follow the out-of-state cases cited by appellants. Most of these cases provide little or no analysis and permit recovery of lost punitive damages solely based on the general rule that the measure of damages in a legal malpractice action is the value of the lost claim. These cases largely ignore public policy—including the public purpose of punitive damages.[2] Only the federal court in *Jacobsen v. Oliver, supra,* 201 F.Supp.2d at pages 101-102, even attempted to weigh the relevant public policy considerations. Its analysis, however, is incomplete, and we do not find it persuasive for the reasons stated above. (See *ante,* at pp. 1046-1052.) Accordingly, we agree with *Piscitelli v. Friedenberg, supra,* 87 Cal.App.4th 953, 983, *Cappetta v. Lippman, supra,* 913 F.Supp. 302, 306, and *Summerville v. Lipsig* (2000) 270 A.D.2d 213 [704 N.Y.S.2d 598, 599], and hold that a plaintiff in a legal malpractice action may not recover lost punitive

---

[2](See, e.g., *Ingram v. Hall, Roach, Johnston, Fisher & Bollman* (N.D.Ill. 1996) 1996 WL 54206, p. *2; *Hunt v. Dresie* (1987) 241 Kan. 647 [740 P.2d 1046, 1057]; *Haberer v. Rice* (S.D. 1994) 511 N.W.2d 279, 286; *Patterson & Wallace v. Frazer* (1906) 100 Tex. 103 [94 S.W. 324, 326]; *Elliott v. Videan* (1990) 164 Ariz. 113 [791 P.2d 639, 645-646]; *Scognamillo v. Olsen* (Colo.Ct.App. 1990) 795 P.2d 1357, 1361.)

damages as compensatory damages.[3] We therefore disapprove of *Merenda v. Superior Court, supra,* 3 Cal.App.4th 1, to the extent it conflicts with our decision today.

DISPOSITION

We affirm the judgment of the Court of Appeal.

George, C. J., Baxter, J., and Chin, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I agree with the majority that these two plaintiffs in a legal malpractice action may not recover as compensatory damages the punitive damages they allegedly lost when, as part of a settlement in the underlying class action, the attorneys for the class stipulated to a dismissal of the punitive damages sought by the class. But, unlike the majority, I would leave for another day the determination whether today's holding applies to cases outside the class action context, when considerations different from those involved here may lead to a different conclusion.

I.

Plaintiffs are two of over 12,000 individuals who, after exposure to a toxic chemical emanating from a leak at a refinery, joined a class action against the refinery's owner. Plaintiffs were among eight objectors to the $80 million settlement, which included a stipulation for dismissal of the punitive damage claims. The trial court approved the settlement, finding that "the public's interest in punishing . . . and deterring" the defendant had been achieved, and that the settlement was made in good faith (Code Civ. Proc., § 877.6).

Under the terms of the settlement, plaintiffs were free to seek a jury trial on their compensatory damage claims, but they did not do so. After receiving their arbitration awards, plaintiffs collaterally attacked the settlement through this malpractice action against class counsel, asking for punitive

---

[3]Of course, plaintiffs may recover punitive damages in a legal malpractice action if the attorneys, *themselves,* are guilty of "oppression, fraud, or malice" (Civ. Code, § 3294, subd. (a)), but the measure of punitive damages would depend on the gravity of the attorneys' misconduct and their wealth.

damages lost to them, when as part of the settlement, counsel stipulated to a dismissal of the punitive damage claims of the non-opt-out class.

I agree with the majority that this case presents important issues of public policy. In my view, however, the crucial policy issues spring from both the nature and resolution of the underlying class action lawsuit. This court long ago acknowledged that public policy encourages the use of class actions. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 473 [174 Cal.Rptr. 515, 629 P.2d 23].) Public policy favoring settlement is especially weighty for class actions. (*Franklin v. Kaypro Corp.* (9th Cir. 1989) 884 F.2d 1222, 1229; *Cotton v. Hinton* (5th Cir. 1977) 559 F.2d 1326, 1331.) Settlement of class actions is encouraged precisely because they "consume substantial judicial resources and present unusually large risks for the litigants." (*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation* (3d Cir. 1995) 55 F.3d 768, 805.)

If we permitted all dissident members of a class to pursue a malpractice action against class counsel for punitive damages relinquished by settlement, attorneys would have little incentive to bring class actions and even less incentive to settle them. Counsel acting pro bono would be especially unlikely to undertake class representation. (See *Thomas v. Albright* (D.D.C. 1999) 77 F.Supp.2d 114, 123 ["In a world fraught with numerous injustices that can only be vindicated through the vehicle of a class action, attorneys should not be dissuaded from bringing meritorious actions by the threat of a state court malpractice law suit."].) And, as this case illustrates, permitting such a collateral attack undermines the very authority of the judiciary. Here, two of 12,000 class members sought to recoup from class counsel potential punitive damages based on a claim that had been bargained away in exchange for a global settlement of $80 million, even though the trial court expressly found the settlement to have been made in good faith and to have vindicated the public interest in "punishing, . . . and deterring" the defendant's conduct. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348].)

To permit plaintiffs to now collaterally attack what they perceive to be an insufficiently lucrative settlement in the underlying class action violates an overriding public policy favoring settlement of class actions. On this point, I agree with the majority. Unlike the majority, however, I would stress the narrowness of the holding, leaving for another day whether the same considerations would apply outside the class action context. I outline my concerns below.

## II.

The vast majority of legal malpractice claims do not arise from class actions or from class action settlements, as in this case. Probably the most frequent type of attorney malpractice occurs when counsel fails to timely file a complaint or preserve a claim, leaving the client with no recourse except a malpractice action against counsel. The measure of damages for legal malpractice is the value of the claim lost (*Smith v. Lewis* (1975) 13 Cal.3d 349, 361 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231]) or all detriment proximately caused by the malpractice (Civ. Code, § 3333). But often an injured client suffers only a small economic loss or incurs substantial noneconomic harm not easily valued in dollars and cents. When the client's injury is caused by especially egregious conduct, the value of the client's claim may lie almost entirely in a large punitive damage recovery. (See *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 582 [116 S.Ct. 1589, 1602, 134 L.Ed.2d 809] [in such cases low compensatory damages will support higher ratio of punitive damages].) By denying recovery for lost punitive damages in *every* legal malpractice action, instead of limiting today's holding to the confines of a class action settlement, the majority effectively denies such injured clients anything but a nominal recovery of compensatory damages, insulating the attorneys while failing to fully compensate the clients for the loss caused by the malpractice.

The majority condemns a claim of lost punitive damages as too speculative. Yet, whether a jury trying the underlying claim would have awarded punitive damages, and how much it would have awarded but for the claim's forfeiture, are no more speculative than whether the client would have prevailed had the claim gone to trial and how much in compensatory damages the jury would have awarded. Lost punitive damages, like any other item of compensatory damage in a malpractice action, must be proven to a degree of reasonable certainty. (*Clemente v. State of California* (1985) 40 Cal.3d 202, 219 [219 Cal.Rptr. 445, 707 P.2d 818].)

In a malpractice action, punitive damages lost because of attorney error are not true punitive damages but are merely *a measure* of some of the injury resulting from the attorney's malpractice. Thus, lost punitive damages are a form of compensatory damages. In tort law, a goal of awarding compensatory damages is to deter harmful conduct by making the wrongdoer compensate the person harmed. (1 Dobbs, The Law of Torts (2001) § 10, p. 17.) As Justice Puglia explained in *Merenda v. Superior Court* (1992) 3 Cal.App.4th 1 [4 Cal.Rptr.2d 87], a legal malpractice plaintiff "should be entitled to

recover . . . as compensatory damages the amount of punitive damages [the plaintiff] proves she would have obtained . . . in the underlying action. This amount is a portion of the difference between the amount of the actual recovery . . . and the amount which would have been recovered but for" the attorney's negligence. *(Id.* at p. 12.)

When the majority here suggests that an award of lost punitive damages inappropriately punishes a merely negligent attorney, it conflates lost punitive damages as one measure of compensatory damage with punitive damages assessed against a particularly culpable party. (Maj. opn., *ante,* at p. 1047.) If the attorney has not performed competently, the attorney is liable for the client's injury, including punitive damages lost to the client because of the attorney's deficient performance. Only if an attorney commits malpractice and does so oppressively, fraudulently, or maliciously is the attorney liable for punitive damages. Conceivably, an attorney could be liable for both types of damages, but analytically only the latter would be punitive damages.

Not only are lost punitive damages subject to proof at trial of the malpractice claim, but the amount of an award for lost punitive damages is ultimately constrained by due process. As the United States Supreme Court held recently, "few awards [of punitive damages] exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *(State Farm Mutual Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, __ [123 S.Ct. 1513, 1524, 155 L.Ed.2d 585].) The high court went on to note that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages can reach the outermost limit of the due process guarantee." *(Ibid.)*

The majority here observes that permitting recovery of lost punitive damages in legal malpractice actions may "exact a significant social cost" by driving insurers offering professional liability coverage out of the California market. (Maj. opn., *ante*, at p. 1050.) That is an issue to be addressed to the Legislature, not to this court. Moreover, the majority's observation assumes that until now, both in this state and in the majority of other jurisdictions that have addressed the question, legal malpractice actions have not permitted recovery of lost punitive damages as an item of compensatory damage. Not so. So far, only one state excludes recovery of lost punitive damages. Thus, the general rule is this: "Attorneys can be liable for exemplary or punitive damages lost or imposed because of their negligence." (3 Mallen & Smith, Legal Malpractice (5th ed. 2000) Damages, § 20.7, p. 136, fn. omitted.) The

majority does not explain why a malpractice insurance crisis will result from leaving in place a rule that has prevailed until now in many jurisdictions, including California.

In sum, I am not persuaded that the public policy rationales the majority advances support the broad rule it announces.

### III.

Finally, I reject the majority's suggestion that its decision follows from this court's decision in *PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310 [84 Cal.Rptr.2d 455, 975 P.2d 652] (*PPG*). In *PPG*, a driver who was seriously injured because of a defectively installed windshield received an award of compensatory and punitive damages against the window installer. In a later suit by the installer against its insurer, we declined to permit the installer to shift to the insurer its liability for the punitive damage award. The installer had intentionally used a faster and cheaper way to install replacement windshields instead of the method recommended by the truck's manufacturer, but continued to charge an amount based on the recommended method. (*Id.* at p. 314.) We explained that public policy would not permit the installer to shift to its insurer liability for its own intentional wrongdoing merely because the insurer had negligently failed to settle the case before trial. (*Id.* at p. 317.) The installer, we said, should not be able to obtain indemnification from the installer's insurer for its own wrongdoing. We concluded that allowing the installer to shift its duty to pay punitive damages would not serve the public purpose of punishing and deterring the installer's egregious misconduct. Of the two culpable parties, the insurer, although liable for failing to settle, was not "the party actually responsible for the wrong" inflicted upon the truck driver. (*Ibid.*) *PPG* held that as between two potentially blameworthy parties, sound policy reasons prohibited allowing the blameworthy installer, whose conduct brought about the punitive damage award, from shifting responsibility for punitive damages to its insurer, whose fault lay in failing to settle the case before a punitive damage verdict was returned. (*Id.* at p. 319.)

In a client's action against an attorney for lost punitive damages, unlike the situation in *PPG*, only one of the parties—the attorney—is blameworthy. The client is a victim twice over—a victim first of the third party's intentional tort and second of the attorney's malpractice. Such an action, unlike the lawsuit in *PPG*, does not involve a more culpable party's attempt to shift to a less culpable party a liability resulting from its own intentional

wrongdoing; instead, it involves a nonculpable party's attempt to obtain full compensation from a culpable party for the complete financial loss caused by the culpable party's negligence. No public policy forbids such compensation.

For the reasons given above, I join in affirming the judgment of the Court of Appeal, but I do not join in either the majority's reasoning or the broad application of the rule it announces.

Werdegar, J., and Moreno, J., concurred.