[No. A099014. First Dist., Div. One. Aug. 8, 2003.]

BRANDON G., a Minor, etc., et al., Plaintiffs and Appellants, v. PATRICIA GRAY, Defendant and Appellant.

COUNSEL

Law Offices of Paul A. Frassetto and Paul A. Frassetto for Plaintiffs and Appellants.

Provencher & Flatt and Douglas B. Provencher for Defendant and Appellant.

## OPINION

**STEIN, ACTING P. J.**—Patricia Gray, an attorney, appeals from a judgment awarding her former client, Mr. G., as guardian ad litem for his two children (plaintiffs), the sum of $41,724.40 on Mr. and Mrs. G.'s action against Gray for legal malpractice. Plaintiffs also have appealed from the judgment, contending the trial court erred in calculating the damages owed by Gray.

### FACTUAL/PROCEDURAL BACKGROUND

In December 1992, Mr. and Mrs. G. enrolled their children in the KidStop daycare facility in Sonoma County, operated by Donna and Phillip Moore. Before enrolling the children, Mr. and Mrs. G. checked with the County of Sonoma Social Services Department (the County) and were told that KidStop was licensed, no complaints had been made about it, and it appeared to be a good daycare facility. This information was a factor in Mr. and Mrs. G.'s decision to enroll their children at KidStop. On June 14, 1993, their older child reported that Phillip Moore had sexually molested her. Their other child was too young to communicate his own experiences, but the older child reported that Phillip Moore had not molested him. In July 1993, the younger child saw a newspaper photograph of Moore and reacted violently, making comments that indicated Moore had sexually molested him, too.

Moore later pled guilty or no contest to molesting several children at KidStop, including the older G. child.

On July 16, 1993, Mr. and Mrs. G. read a newspaper article about Moore that mentioned that two minor complaints had been made about KidStop. Mrs. G. went to the County and looked at its file on KidStop. It contained a number of complaints that predated Mr. and Mrs. G.'s involvement with KidStop. There was a complaint that a baby gate had been left open. There were several complaints that the facility was taking care of more children than it was licensed to care for. One parent complained that Donna Moore had yanked an infant by the arm and had yelled at him. This child also was observed to have a splotchy red back and a bruise on one cheek. There was a complaint that the children at the facility were given skimpy lunches and no milk. There was a complaint that the Moores' dog, which was allowed to mingle with the children, had bitten a neighbor.

In November 1993, Mr. and Mrs. G. hired Attorney James M. Barrett and the law firm of Cantor, Barrett & Wheeldin to represent the minors in an action against the County for misrepresenting that no complaints had been filed against KidStop and that it was a good daycare facility. Barrett obtained an order appointing Mrs. G. to act as the children's guardian ad litem, but took no further action.

In June 1994, Mr. and Mrs. G. saw a newspaper article reporting that other parents had filed a lawsuit against the County, and became concerned that Barrett did not seem to be pursuing their case. They learned from a friend, an attorney, that they needed to take action against the County within a year of learning of the County's misrepresentations. The friend gave them Gray's name, and they contacted her on June 14 or 15. They told Gray about the case, discussing the dates that they had learned about the molestations and the dates they learned about the County's misrepresentations. Gray agreed to take the case, telling them that they had a month in which to file claims against the County. Mr. and Mrs. G. wrote to Barrett that they would not be requiring any further assistance from him, asking him to forward his records on the matter to Gray.

On July 15, 1994, Gray filed claims against the County. The County rejected the claims for failing to file an application to file late claims. In September, Gray filed an application to file late claims. Gray then was elected to the bench, and transferred the case to an attorney who was representing other children and parents in actions against the Moores. After this attorney filed suit against the County on plaintiffs' behalf, the court granted summary judgment to the County on the basis that no application to file late claims had been filed. This court affirmed that judgment on appeal.

Plaintiffs then instituted this action for legal malpractice against Gray Barrett, and the law firm of Cantor, Barrett & Wheeldin. Barrett and his firm

entered into good faith settlements with plaintiffs, each paying $24,500, for a collective payment of $49,000. The matter proceeded to trial against Gray. A jury returned a special verdict, finding that as a result of the molestations, each child had suffered economic damages in the amount of $20,000 and noneconomic damages in the amount of $125,000. The jury further found that Phillip and Donna Moore were 80 percent responsible for these damages and that the County was 20 percent responsible for the damages. As to the legal malpractice claim, the jury apportioned negligence between Mr. and Mrs. G. (10 percent), Barrett (35 percent), and Gray (55 percent). The court thereafter entered judgment against Gray in the amount of $41,724.40.

These appeals followed.

## GRAY'S APPEAL

### I.

#### ACCRUAL OF MR. AND MRS. G.'S CLAIMS

■ Actions against a public entity, such as the County, are governed by the California Tort Claims Act (Gov. Code, § 900 et seq.). Under the Tort Claims Act, a plaintiff may not maintain an action for damages against a public entity unless a written claim first has been presented to the defendant and has been rejected (Gov. Code, §§ 905, 945.4). A claim based on a personal injury cause of action must be presented within six months of the date the cause of action accrued (Gov. Code, § 911.2). After six months, a plaintiff may apply to the public entity for leave to present a late claim. The application must be presented within a reasonable time, not to exceed one year after the cause of action accrued (Gov. Code, § 911.4). If the application is denied, the plaintiff may, within six months, petition the court for an order for relief from the claims-presentation procedures (Gov. Code, § 946.6). (*Christopher P. v. Mojave Unified School Dist.* (1993) 19 Cal.App.4th 165, 168–169 [23 Cal.Rptr.2d 353].) The court, however, lacks jurisdiction to grant relief if the application to file a late claim was filed more than one year after the cause of action accrued. (*Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1779 [39 Cal.Rptr.2d 860].)

Plaintiffs' position was and is that the cause of action against the County accrued on July 16, 1993, when Mr. and Mrs. G. first learned that, contrary to the representations of the County, complaints had been filed against KidStop. The six-month period for filing a claim without also filing an application to file a late claim, therefore, had expired by the time Mr. and Mrs. G. hired Gray on June 16, 1994. At that point, plaintiffs had to file an application to file late claims no later than July 15, 1994. Although Gray filed plaintiffs'

claims by that date, she did not file an application to file late claims, effectively precluding plaintiffs not only from obtaining relief through the claims procedures, but also from pursuing court action against the County.

Gray's position was and is that plaintiffs' cause of action accrued not when they learned that the County's misrepresentations were false, but on June 14, 1993, when they learned that at least one child had been molested. If Gray is correct, the time for filing claims against the County expired before plaintiffs hired Gray, and Gray's negligence, therefore, was not a cause of any harm to plaintiffs.

■ In general, a claim accrues upon the occurrence of the last element essential to the cause of action, even if the plaintiff is unaware of the cause of action. Under the "delayed discovery rule," however, the accrual date of a cause of action is delayed until the plaintiff is aware of his or her injury and its cause. The plaintiff is charged with this awareness as of the date he or she suspects or should suspect that the injury was caused by someone's wrongful act. The period of limitations, therefore, will begin to run when the plaintiff has a "suspicion of wrongdoing"; in other words, when he or she has notice of information of circumstances to put a reasonable person on inquiry. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109–1111 [245 Cal.Rptr. 658, 751 P.2d 923].)

Code of Civil Procedure section 338, subdivision (d), effectively codifies the delayed discovery rule in connection with actions for fraud, providing that a cause of action for fraud "is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." In a case such as this, that date is the date the complaining party learns, or at least is put on notice, that a representation was false. In *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471 [55 Cal.Rptr.2d 225], for example, the plaintiff allegedly was induced to leave his former employment by the representation that the defendant employer followed a nondiscrimination policy. The court held that the crucial event for accrual purposes was the date on which the plaintiff first learned that the employer actually followed a discriminatory policy; i.e., the date the plaintiff learned that the representation was false. (*Id.* at p. 484.) In *Snow v. A. H. Robins Co.* (1985) 165 Cal.App.3d 120, 135 [211 Cal.Rptr. 271], similarly, the court ruled that a cause of action for misrepresentations about a defective intrauterine contraceptive device accrued not when the plaintiff became pregnant, but when she learned that the manufacturer had misrepresented the effectiveness of the device. Here, for purposes of plaintiffs' claims of misrepresentation, the relevant date was July 16, 1993, when Mr. and Mrs. G. learned that the County had falsely represented that it had received no complaints about KidStop.

Gray cites *Soliman v. Philip Morris Inc.* (9th Cir. 2002) 311 F.3d 966. The plaintiff in *Soliman* suffered injuries resulting from long-term use of tobacco. He contended that his cause of action for products liability was delayed until he first learned that the manufacturers had concealed the health hazards of smoking. The Ninth Circuit Court of Appeals rejected that claim, finding the injury itself provided reason for the plaintiff to suspect that the manufacturers had done something wrong. As noted by the court, " '[O]nce a plaintiff is aware that he ... has been injured by a product, [he] has enough information to commence a products liability action based on that injury.' " (*Id.* at p. 972, quoting *Arnold v. R.J. Reynolds Tobacco Co.* (D.R.I. 1997) 956 F.Supp. 110, 117.) At the most, *Soliman* stands for the proposition that a person who suffers harm from a product is thereby put on notice that an earlier representation that the product will cause no harm was false. *Soliman* has no application here, where the County never represented that Moore would do no harm.

Gray, citing *Miller v. Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1622 [2 Cal.Rptr.2d 796], points out that if a statute of limitations bars an action based upon harm immediately caused by a defendant's wrongdoing, a separate cause of action based on a subsequent harm arising from that wrongdoing normally is barred. The rule stated in *Miller* presumes that the plaintiff is seeking damages for separate injuries resulting from a single defendant's wrong.[1] It has no application here, where there is one injury but separate claims, based on separate theories, against separate tortfeasors.

Gray emphasizes that plaintiffs would not have had a cause of action against the County if they had suffered no injury. Although Gray is correct, it does not alter the fact that plaintiffs' claims against the County were based on the County's misrepresentation, and therefore did not accrue until plaintiffs were on notice that the County had made a misrepresentation.

---

[1] In *Miller,* for example, the plaintiff suffered allergies and asthma allegedly as a result of mold in her condominium. Several years later she was diagnosed with immune dysregulation, also caused by exposure to the mold in the condominium. The court held that her claim for damages for the immune dysregulation accrued when she first suffered appreciable and actual harm as a result of her exposure to the mold and became aware that the defendant's negligence caused that harm. That the plaintiff was not initially diagnosed as suffering from immune dysregulation did not toll the statute of limitations. (*Miller v. Lakeside Village Condominium Assn., supra,* 1 Cal.App.4th at pp. 1624–1625.)

## II.

### Jury Instructions

Gray contends the jury improperly was instructed that a claim for negligent misrepresentation accrues on the date the plaintiff discovers the facts constituting a misrepresentation, or has or should have a suspicion that a misrepresentation has been made or has other knowledge that would put a reasonable person on inquiry. This contention is based on Gray's argument, discussed above, that plaintiffs' claims for misrepresentation accrued on the date they learned of the molestations. We rejected that argument, and we reject this argument for the same reasons.

## III.

### Failure to Construe Late Claims as Petition to File Late Claims

Gray contends the County should have accepted the claims, filed on July 15, 1994, as petitions to file late claims. Whether the County did or did not act properly was litigated in the earlier action, which long since has become final. Since this contention had no place in the trial of this case and was not litigated in this case, it provides no grounds for reversing this judgment.

## IV.

### Effect of Prior Settlement

The jury found that each of the children suffered economic damages in the amount of $20,000 and noneconomic damages in the amount of $125,000, for a total amount of economic damages of $40,000 and noneconomic damages of $250,000. The jury also found that the Moores were 80 percent responsible and the County 20 percent responsible for these damages. Under Civil Code section 1431.2, which distinguishes between economic and noneconomic damages in actions for personal injury, the County was jointly and severally liable for $40,000, representing all of plaintiffs' economic damages, and severally liable for $50,000, representing 20 percent of plaintiffs' noneconomic damages.[2] The legal malpractice of Gray and Barrett, therefore, caused

---

[2] Civil Code section 1431.2 provides: "(a) In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for noneconomic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount. [¶] (b)(1) For purposes of this section,

plaintiffs to lose claims valued at $90,000. The jury found that Gray was 55 percent responsible for the malpractice damages. The jury found that Barrett and his firm were 35 percent responsible and Mr. and Mrs. G. themselves were 10 percent responsible for those damages. Barrett and his firm settled for $49,000. The trial court found that Gray was entitled to a credit for a portion of this amount, calculating her liability in the following manner:

| | |
|---:|---|
| $40,000.00 | Total economic damages for minor plaintiffs |
| -4,000.00 | Reduction of 10 percent for parents' contributory negligence |
| 36,000.00 | |
| -21,775.60 | Economic portion of Barrett et al. settlement (44.44 percent of $49,000) |
| 14,224.40 | Gray's share of remaining economic damages |
| +27,500.00 | Gray's 55 percent of plaintiffs' $50,000 noneconomic damages |
| $41,724.40 | Gray's total liability |

Gray contends that the court erred in concluding that plaintiffs suffered any economic damages. According to Gray, the court should have determined that the full amount of Gray's liability was 55 percent of the total award, or $49,500, and then, pursuant to Code of Civil Procedure section 877,[3] should have offset that sum by the $49,000 paid by Barrett and his firm. Plaintiffs counter that under Civil Code section 1431.2 and *Espinoza v. Machonga* (1992) 9 Cal.App.4th 268 [11 Cal.Rptr.2d 498], a nonsettling defendant is not entitled to offset that portion of another defendant's settlement attributable to noneconomic damages. According to plaintiffs, therefore, the court should have offset Barrett's portion of the economic damages only against the economic damages owed by Gray, a procedure, according to plaintiffs' calculations, that would have left Gray responsible for $49,500.[4]

---

the term 'economic damages' means objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities. [¶] (2) For the purposes of this section, the term 'non-economic damages' means subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation."

[3] Code of Civil Procedure section 877 provides, as relevant: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, ... it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater."

[4] Plaintiffs state their calculations as follows: "The jury's determination of $40,000 for economic damages in the case against Sonoma County equals 44.4% of the total $90,000 value

We find that neither of the theories for calculating damages asserted by the parties, nor the theory of damages adopted by the trial court, is correct. In the present action for legal malpractice, plaintiffs seek damages representing the recovery they would have had from the County but for the negligence of their attorneys. Civil Code section 1431.2, which by its terms applies only to actions for personal injury, property damage or wrongful death, would have applied to any action by plaintiffs for personal injury against the County. Under that section, the County would be jointly liable for plaintiffs' economic damages, but only severally liable for their noneconomic damages. That the damages in the underlying personal injury action, however, could be characterized as "economic" or "noneconomic," or that this characterization limited the extent of the County's liability to plaintiffs, is of no import. Here, although plaintiffs' claims against the *County* were for personal injury, their suit against their *attorneys* was for attorney malpractice. Such an action is not one for "personal injury, property damage or wrongful death." It is an action for the value of the claim lost as a result of the failure to press a meritorious claim. (*Smith v. Lewis* (1975) 13 Cal.3d 349, 361–362 [118 Cal.Rptr. 621, 530 P.2d 589], overruled on another point in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, fn. 14 [126 Cal.Rptr. 633, 544 P.2d 561].)[5] Civil Code section 1431.2, therefore, does not apply.[6]

Gray is responsible for the full amount of plaintiffs' loss, less the amount attributable to Mr. and Mrs. G.'s negligence. Under Code of Civil Procedure

of the underlying case. Therefore, Barrett's settlement of $49,000 reflects 44.4% (or $21,756) for economic damages and 55.6% (or $27,244) for noneconomic damages. Accordingly, GRAY is entitled to a reduction of liability of only $21,756, which is the amount of Barrett's payment that reflects economic damages. [¶] Because the settlement set off of $21,756 does not reduce $90,000 below $49,500 (even after deducting [Mr. and Mrs. G.'s] 10% contributory fault), the total judgment against GRAY should be $49,500."

[5] The Supreme Court, in *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037 [135 Cal.Rptr.2d 46, 69 P.3d 965], underscored the distinction between an underlying case and a subsequent case against the attorney for legal malpractice. The court there held that the attorneys would not be liable for an award of punitive damages allegedly lost as a result of their professional negligence, in part because the wrongful conduct of the tortfeasor in the underlying case should not be imputed to the attorneys in the subsequent malpractice case. (See also *Granquist v. Sandberg* (1990) 219 Cal.App.3d 181, 184–185 [268 Cal.Rptr. 109] [giving an attorney in a malpractice action the benefit of a limitation on damages available to the tortfeasor in the underlying case disclosed a "basic flaw" in the trial court's reasoning].)

[6] Even if Civil Code section 1431.2 applied, the defendants in this malpractice action would be jointly liable for the full amount of Mr. and Mrs. G.'s economic damages, except for the portion attributable to Mr. and Mrs. G.'s own negligence. Since the recovery Mr. and Mrs. G. would have had against the County is an "objectively verifiable monetary loss" under Civil Code section 1431.2, subdivision (b)(1), it would be characterized as "economic damages." Civil Code section 1431.2 would not, therefore, limit the extent of Gray's liability for the malpractice. To the contrary, Civil Code section 1431.2 supports the view that Gray is responsible for the full amount of the G.'s damages, except for the amount attributable to Mr. and Mrs. G.'s own negligence.

section 877, subdivision (a), however, she is entitled to offset that amount by the sum paid by the settling defendants. The jury found that plaintiffs' damages were $90,000, and that Mr. and Mrs. G. were responsible for 10 percent of that amount, or $9,000. The defendants, therefore, were jointly responsible for $81,000.[7] Barrett and his firm then entered into good faith settlements, under which they paid $49,000. Under Code of Civil Procedure section 877, subdivision (a), Gray is entitled to a credit for the full $49,000 paid under the settlements. The damages award against Gray, therefore, should have been only $32,000.

## MR. AND MRS. G.'S APPEAL

Plaintiffs contend the evidence fails to support the findings that Barrett was 35 percent at fault for their damages and that Mr. and Mrs. G. were 10 percent at fault for those damages. Plaintiffs argue that Barrett's failure to pursue their claims caused no harm to them because Gray had a month to seek permission to file late claims after the case was transferred to her. They further argue that they cannot be deemed to have been negligent in failing to pursue the claims themselves as they had hired attorneys to act on behalf of the children.

As discussed above in connection with Gray's argument concerning the proper apportionment of Barrett's settlement, once Barrett and his firm entered into good faith settlements, their comparative fault in causing plaintiffs to lose their claims against the County became irrelevant. Gray would be entitled to offset the settlement amounts irrespective of the percentage of fault the settling defendants may or may not have had in causing plaintiffs' damages. (Code Civ. Proc., § 877, subd. (a).)

As to the contention that the evidence does not support a finding that Mr. and Mrs. G. themselves were 10 percent negligent, the applicable law was summarized by the court in *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1233–1234 [32 Cal.Rptr.2d 136]: "Since the comparative fault doctrine was first adopted in California … [citation] our Supreme Court has repeatedly acknowledged that it is designed to permit the trier of fact to consider all relevant criteria in apportioning liability. The doctrine 'is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury … in order to arrive at an "equitable apportionment or allocation of loss." ' [Citation.] ' "[C]omparative negligence" ' does not lend itself to 'the exact

---

[7] If Barrett and the Barrett firm were still in the case as party defendants, it would have been appropriate to have the jury determine their comparative fault for purposes of contribution between defendants; however, once Barrett and his firm entered into good faith settlements, there was no need to determine the comparative fault of the defendants.

measurements of a micrometer-caliper.' [Citations.] The court has also noted that juries are 'fully competent to apply comparative fault principles ....' [Citations.] ... [¶] As one commentator has noted, '[c]ourts in comparative negligence states are usually circumspect about altering determinations made by the jury. The courts will rarely disturb the jury's apportionment of negligence between parties or reverse findings for the plaintiff or defendant.' [Citation.] [¶] This court reviews the jury's apportionment of fault under the substantial evidence standard. [Citation.] ... [T]he jury's power to apportion fault is as broad as its duty to resolve conflicts in the evidence and assess credibility: 'These same considerations apply to the jury's apportionment of fault under comparative negligence rules. Furthermore, the appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment. [Citation.]' [Citation.]"

We agree that Mr. and Mrs. G. took appropriate action in seeking legal advice. We also agree that the attorneys were primarily at fault for the loss of the ability to pursue claims against the County. But there was evidence presented here that Mr. and Mrs. G., acting as guardians ad litem for their children, did little or nothing to pursue their claims for over seven months after hiring Barrett in November 1993. They became concerned when they learned that other parents had filed claims, but there is no evidence that they contacted the other parents or the parents' attorney to investigate the situation. When they learned from a friend that their children were at risk of losing the ability to seek relief from the County, they took their case to Gray. By that time, however, they had lost the ability to file a timely claim, and had only a short time in which to seek relief from the claims requirements. As a result, the risk increased that some miscalculation or error in seeking relief would be irremediable.

"The appointment of a guardian ad litem is not a bare technicality and the office of guardian involves more than perfunctory or shadowy duties. It is the duty of a guardian ad litem to protect or defend a suit, as the case may be." (*Berry v. Chaplin* (1946) 74 Cal.App.2d 652, 657–658 [169 P.2d 442].) "[T]he guardian oversees any attorney representing [a] minor's litigation-related interests and may make tactical and even fundamental decisions affecting the litigation, but always with the interest of the minor in mind. [Citation.]" (*County of Los Angeles v. Superior Court* (2001) 91 Cal.App.4th 1303, 1311 [111 Cal.Rptr.2d 471].)

It is true that the primary responsibility for pursuing the children's claims lay with the attorneys hired by Mr. and Mrs. G. We cannot, however, find error in the conclusion that Mr. and Mrs. G., as the children's guardians ad litem, could not simply abdicate all responsibility for those claims by

hiring an attorney. The jury was entitled to conclude that Mr. and Mrs. G. owed the children a duty to take an active role in pursuing the claims and in overseeing the attorneys to ensure that all appropriate actions were being taken. The jury's finding that Mr. and Mrs. G. were 10 percent at fault for the loss of the claims does not exceed the bounds of reason, and its finding will not be reversed here.

## CONCLUSION

The judgment is modified to reduce the award of damages to plaintiffs to $32,000. As so modified, the judgment is affirmed. Plaintiffs are awarded their costs in responding to the appeal. Gray is awarded her costs in responding to plaintiffs' appeal.

Swager, J., and Margulies, J., concurred.

The petition of appellant Patricia Gray for review by Supreme Court was denied October 22, 2003. Brown, J., did not participate therein.