Filed 6/1/15

# IN THE SUPREME COURT OF CALIFORNIA

STATE DEPARTMENT OF STATE HOSPITALS et al.,

        Petitioners,

        v.

THE SUPERIOR COURT OF LOS ANGELES COUNTY,

        Respondent;

ELAINA NOVOA, Individually and as Personal Representative, etc.,

        Real Party in Interest.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

S215132

Ct.App. 2/3 B248603

Los Angeles County
Super. Ct. No. BC487936

In 2007, Gilton Pitre was paroled from state prison. Before his release, the State Department of Mental Health (DMH) assessed whether he should be civilly committed under the Sexually Violent Predators Act (SVPA). (Welf. & Inst. Code, § 6600 et seq.) Ultimately, the Director of Mental Health did not request a petition for commitment and Pitre left prison. Four days later, he raped and murdered plaintiff Elaina Novoa's 15-year-old sister, Alyssa Gomez.

Plaintiff sued DMH and two of its acting directors, claiming the death was caused by defendants' failure to discharge mandatory duties imposed by the SVPA. The superior court overruled a demurrer. Defendants petitioned for a writ of mandate. The Court of Appeal issued an order to show cause, and concluded

that while the SVPA imposed a mandatory duty on defendants, the alleged breach was not the proximate cause of Gomez's death.  We affirm.

I.  BACKGROUND

A.  *The SVPA*

The SVPA authorizes the involuntary civil commitment of a person who has completed a prison term but is found to be a sexually violent predator (SVP). (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646 (*Reilly*); *People v. McKee* (2010) 47 Cal.4th 1172, 1185 (*McKee*).)  The SVPA's purposes are " 'to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders.' " (*McKee*, at p. 1203.)  The Welfare and Institutions Code sets forth the relevant procedures.  (Welf. & Inst. Code, § 6600 et seq.)[1]

Section 6600, subdivision (a)(1) defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."[2]  "Whenever the Director of Corrections determines that an individual who is in custody . . . may be [an SVP], the director shall . . . refer the person for evaluation . . . ."  (Former § 6601, subd. (a)(1).)[3]  The statutory scheme establishes a multiple-level review for inmates who may be SVPs.  An inmate who is referred

---

[1]    Unspecified statutory references are to the Welfare and Institutions Code.

[2]    "Sexually violent offense" is defined in section 6600, subdivision (b).

[3]    Citations to former SVPA sections are to the law as it existed in 2007, as amended by Proposition 83, approved by the voters on November 7, 2006.  (73D West's Ann. Welf. & Inst. Code (2007) p. 107 et seq,; see *McKee*, *supra*, 47 Cal.4th at p. 1186.)  Although the SVPA has subsequently been further amended, none of the changes are material for purposes of our analysis.

by the Director of Corrections is then "screened by the Department of Corrections . . . based on whether the person has committed a sexually violent predatory offense and on a review of the person's social, criminal, and institutional history. This screening shall be conducted in accordance with a structured screening instrument developed and updated by [DMH] in consultation with the Department of Corrections. If as a result of this screening it is determined that the person is likely to be [an SVP], the Department of Corrections shall refer the person to [DMH] for a full evaluation of whether the person [is an SVP]."[4] (Former § 6601, subd. (b).)

If an inmate is referred for full evaluation, "[DMH] shall evaluate the person in accordance with a standardized assessment protocol, developed and updated by [DMH], to determine whether the person is [an SVP] . . . ." (§ 6601, subd. (c).) The scope of the evaluation is codified in some detail. "The standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (*Ibid.*) Moreover, "the person shall be evaluated by two practicing psychiatrists or psychologists, or one practicing psychiatrist and one practicing psychologist, designated by the Director of Mental Health. If both evaluators concur that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and

---

**4**     DMH is now petitioner and defendant State Department of State Hospitals, and DOC is now the Department of Corrections and Rehabilitation. Here we use the state entities' former names as set out in the applicable 2007 version of the SVPA.

3

custody, the Director of Mental Health shall forward a request for a petition for commitment" to the designated counsel of the county in which the inmate was convicted.[5]  (Former § 6601, subd. (d).)

If the evaluators disagree about whether the person meets the criteria, "the Director of Mental Health shall arrange for further examination of the person by two independent professionals . . . ."  (§ 6601, subd. (e).)  "[A] petition to request commitment . . . shall only be filed if both independent professionals . . . concur that the person meets the criteria for commitment . . . ."  (§ 6601, subd. (f).)  When that requirement is met, "the Director of Mental Health shall forward a request for a petition to be filed for commitment" to the designated counsel of the county. (Former § 6601, subd. (h).)  If counsel concurs with the recommendation, "a petition for commitment shall be filed in . . . superior court . . . ."  (§ 6601, subd. (i).)  The court thereafter "shall review the petition and shall determine whether there is probable cause to believe that the individual . . . is likely to engage in sexually violent predatory criminal behavior upon his or her release."  (§ 6602, subd. (a).)  The court must order a trial if there is probable cause, and it must dismiss the petition if there is not.  (*Ibid.*)

The inmate is "entitled to a trial by jury, to the assistance of counsel, to the right to retain experts or professional persons to perform an examination on his or her behalf, and to have access to all relevant medical and psychological records and reports."  (§ 6603, subd. (a).)  There can be no civil commitment under the SVPA unless the trier of fact determines beyond a reasonable doubt that the person is an SVP.  (§ 6604.)  A person found to be an SVP "shall be committed for

---

[5]     Each county's board of supervisors is required to designate either the district attorney or the county counsel to pursue SVPA civil commitment actions. (§ 6601, subd. (i).)

4

an indeterminate term to the custody of [DMH] for appropriate treatment and confinement in a secure facility . . . ." (*Ibid.*) Annual examinations are conducted to assess whether the person is still likely to engage in sexually violent criminal behavior if discharged. (§ 6605, subd. (a).)

B. *Factual and Procedural History*

On demurrer review, we accept the truth of material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. We may also consider matters subject to judicial notice. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.) In 1996, Pitre raped his female roommate. He was convicted and sentenced to a determinate term in state prison. In 2007, he was scheduled for parole. DOC determined that Pitre was likely to be an SVP, and referred him to DMH for evaluation. DMH, however, did not conduct a full evaluation by two psychologists or psychiatrists, or one of each, as required by statute. Instead, a single evaluator reviewed records received from DOC, and on that limited basis determined that Pitre was suitable for release. The complaint describes this limited evaluation by a single evaluator as a "Level II" screening under DMH regulations in effect at the time. After reviewing a person's records, a "Level II" evaluator could either close a case or refer it for a full "Level III" assessment by two evaluators. Because the Director of Mental Health did not forward a request for a petition for commitment, Pitre was paroled. Four days later, he raped and murdered Gomez.[6]

---

[6] On our own motion, we take judicial notice of the fact that Pitre was convicted in 2010 for the rape and murder of Gomez. (Evid. Code, § 452.) He received consecutive terms of 75 years to life and 25 years to life, consecutive to 10 years for two prior conviction enhancements.

Plaintiff sued, asserting claims for breach of mandatory duty (Gov. Code, § 815.6), negligence, and negligence per se. She also sought a writ of mandate requiring defendants to comply with SVPA evaluation procedures (Code Civ. Proc., § 1085). She claimed that if defendants had conducted the full evaluation required by statute, "any two competent, ethical evaluators would have determined [Pitre] met the criteria for civil commitment," based on "the circumstances of his 1996 offense, as detailed in the records," which "clearly and unequivocally demonstrate the sadistic nature of his crime." She alleged that the single evaluator who reviewed Pitre's case stated that if he had had access to all the records and considered the sadistic nature of Pitre's 1996 crime, he would have concluded that Pitre was an SVP. Plaintiff further alleged that most sexual predators who reoffend exhibit "tell-tale signs," and that a full evaluation would likely have detected such signs in Pitre.

Had there been two positive findings on Pitre's SVP status, DMH was obligated to submit a request for a civil commitment to designated counsel. Plaintiff claimed that a petition has been filed in every case referred by DMH following two positive evaluations. Had a petition been filed, Pitre's case would have gone to trial, the complaint alleged, and "he would have been civilly committed."

Defendants demurred, arguing that plaintiff failed to state a cause of action and that they were immune from liability.[7] The superior court overruled the demurrer. On writ review, the Court of Appeal concluded that defendants were not immune from suit. It held that the SVPA imposes a mandatory duty to use two

---

[7] Defendants invoked Government Code section 845.8, subdivision (a), which provides that a public entity or employee is not liable for "[a]ny injury resulting from determining whether to parole or release a prisoner . . . ."

6

evaluators.  However, the court also ruled that plaintiff could not, as a matter of law, establish the breach of that duty as the proximate cause of Gomez's death. The court further held that plaintiff failed to show she could amend her complaint to cure the defect as to proximate cause.  Accordingly, it directed the superior court to sustain defendants' demurrer to the first and second causes of action.  The writ proceeding in the trial court requiring defendants to discharge their mandatory duties under the SVPA was allowed to go forward.

## II.  DISCUSSION

### A.  *Sovereign Immunity and Duty*

Traditionally, the doctrine of sovereign immunity shielded states from both suit and liability.  (*Franchise Tax Bd. v. Superior Court* (2011) 51 Cal.4th 1006, 1012; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 203, p. 344.) Under the doctrine, a state is immune except to the extent it consents to suit.  (See Prosser & Keeton, Torts (5th ed. 1984) § 131, p. 1033.)  In *Muskopf v. Corning Hospital Dist.* (1961) 55 Cal.2d 211, 221, this court abolished the rule of government immunity from tort liability.

The Legislature responded by temporarily reinstating former law, then replacing it in 1963 with the Government Claims Act (Gov. Code, § 810 et seq.), which sets out a comprehensive scheme of governmental liability and immunity statutes.  (*Thomas v. City of Richmond* (1995) 9 Cal.4th 1154, 1157; 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 216, p. 366.)  Under the act, a public entity is not liable "[e]xcept as otherwise provided by statute."  (Gov. Code, § 815; see *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932.)  One such statute is Government Code section 815.6, which provides, "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an

7

injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Gov. Code, § 815.6.)  Thus, the government may be liable when (1) a mandatory duty is imposed by enactment, (2) the duty was designed to protect against the kind of injury allegedly suffered, and (3) breach of the duty proximately caused injury.

Even when a duty exists, California has enacted specific immunity statutes that, if applicable, prevail over liability provisions.  (*Creason v. Department of Health Services* (1998) 18 Cal.4th 623, 635 (*Creason*); 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 226, p. 375.)  However, the first question is whether the plaintiff has alleged the breach of a mandatory duty.  (*Creason*, at p. 630.)  If there is no actionable duty, the question of immunity does not arise.  (*Ibid*.; *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 985; 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 225, p. 374.)

Courts have delineated what is necessary to establish a mandatory duty.  "First and foremost, . . . the enactment at issue [must] be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken."  (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498 (*Haggis*).)  "It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function *if the function itself involves the exercise of discretion*."  (*Ibid.*, italics added.)  Moreover, "[c]ourts have . . . [found] a mandatory duty only if the enactment 'affirmatively imposes the duty and provides implementing guidelines.' "  (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898 (*Guzman*).)  " ' "[T]he mandatory nature of the duty must be phrased in explicit and forceful language." [Citation.]  "It is not enough that some statute contains mandatory language.  In order to recover plaintiffs have to show

8

that there is some *specific* statutory mandate that was violated by the [public entity].” ’ [Citations.]” (*Id*. at pp. 910-911.)

Whether an enactment imposes “a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts.” (*Creason*, *supra*, 18 Cal.4th at p. 631.) The enactment’s “language ‘is, of course, a most important guide in determining legislative intent, [but] there are unquestionably instances in which other factors will indicate that apparent obligatory language was not intended to foreclose a governmental entity’s or officer’s exercise of discretion.’ ” (*Haggis*, *supra*, 22 Cal.4th at p. 499.) For example, the word “shall” is “mandatory” for purposes of the Welfare and Institutions Code. (§ 15; see Gov. Code, § 14 [same].) “However, as we have emphasized, this term’s inclusion in an enactment does not necessarily create a mandatory duty” within the meaning of Government Code section 815.6. (*Guzman*, *supra*, 46 Cal.4th at p. 899.)

We have recognized that while the “exercise of discretion may often mark the dividing line between a duty that is mandatory and one that is not [citation], that line is sometimes difficult to draw.” (*Guzman*, *supra*, 46 Cal.4th at p. 899.) “[I]n cases not involving a public entity’s ‘ “quasi-legislative policy-making” ’ [citation], the inquiry should focus on whether the entity must ‘render a considered decision’ [citation], one requiring its expertise and judgment [citations].” (*Ibid*.) *Creason* is illustrative. Sierra Creason and her parents sued the Department of Health Services (DHS) after neonatal testing failed to disclose that Sierra was born without a functioning thyroid gland. (*Creason*, *supra*, 18 Cal.4th at pp. 626-627.) The complaint alleged that the test DHS designated was deficient, resulting in failure to diagnose Sierra’s congenital hypothyroidism, which in turn led to a significant delay in treatment and irreversible injury. (*Id.* at p. 627.)

9

The applicable statutory scheme, the Hereditary Disorders Act (Health & Saf. Code, § 124975 et seq.), provided: "[DHS] shall establish a genetic disease unit," and "[t]he unit shall promote a statewide program of . . . testing . . . and shall have the responsibility of designating tests and regulations to be used in executing this program. [¶] The . . . tests . . . shall be in accordance with accepted medical practices and shall be administered to each child born in California once the department has established appropriate regulations and testing methods." (*Id.*, § 125000, subd. (a).) DHS thus had a mandatory duty to establish a neonatal testing program. However, the particular standards for testing and the protocol for reporting were left to its discretion and judgment.

Had DHS taken no action at all, it would have failed to discharge its mandatory duty to designate the tests to be used. But DHS discharged that duty, and the plaintiffs did not allege otherwise. Instead, they argued that the way DHS exercised its judgment in designating tests and implementing procedures caused Sierra's injury. (*Creason*, *supra*, 18 Cal.4th at pp. 627-628.) The *Creason* court concluded that a demurrer was properly granted. Although DHS's duty to designate tests was mandatory, its formulation of those tests and related reporting standards was discretionary and could not give rise to liability. (*Id.* at pp. 629, 635.)

*Creason* and similar cases illustrate the following distinction. A mandatory duty is created only when an enactment requires an act that is clearly defined and not left to the public entity's discretion or judgment. (*County of Los Angeles v. Superior Court* (2012) 209 Cal.App.4th 543, 550-551 (*Faten*).) Such an act is mandated only to the extent of the enactment's precise formulation. When the enactment leaves implementation to an exercise of discretion, "lend[ing] itself to a normative or qualitative debate over whether [the duty] was adequately fulfilled,"

10

an alleged failure in implementation will not give rise to liability.  (*de Villers v. County of San Diego* (2007) 156 Cal.App.4th 238, 260.)

Applying these principles here, we hold that the complaint sufficiently alleges a breach of DMH's mandatory duty to conduct an evaluation with two evaluators.  The SVPA specifies that an inmate referred by DOC "*shall be evaluated* by *two* practicing psychiatrists or psychologists, or one practicing psychiatrist and one practicing psychologist, designated by the Director of Mental Health."  (Former § 6601, subd. (d), italics added.)  This language is clear, conferring no discretion as to the number of evaluators.  (*Haggis*, *supra*, 22 Cal.4th at p. 502; *Faten*, *supra*, 209 Cal.App.4th at p. 551.)  Moreover, the use of *two* evaluators is critical to the SVPA process.  A petition for commitment cannot be requested unless both evaluators agree that a person meets the criteria for SVP status.  (§ 6601, subd. (d).)  If they disagree, the Director of Mental Health must arrange for two independent evaluators to conduct a further examination.  Both must concur that the inmate meets the criteria before a commitment petition can be requested.  (§ 6601, subds. (e) & (f).)  In sum, the enactment's language, taken together with the design of the SVPA process, makes it clear that the Legislature " 'intended to foreclose . . . [the] exercise of discretion' " with regard to how many evaluators must be designated to assess persons referred by DOC.  (*Haggis*, at p. 499.)

Defendants concede they are obliged to "designate two mental health professionals to conduct the 'full evaluation.' "  Citing the discretion woven throughout the SVPA process, however, they argue that the obligation does not amount to a mandatory duty.  Defendants note, for example, that the Director of Corrections first has discretion to determine whether someone might be an SVP, that DOC's subsequent screening is discretionary, and that the evaluators designated by DMH have discretion to determine whether a person meets the SVP

11

criteria. Defendants conclude from this that the *entire* SVPA screening process, including their duty to designate two evaluators, should be considered discretionary. The argument fails. Whatever discretion may be afforded by other provisions, the statute requiring the Director of Mental Health to designate two evaluators affords none.

The only other mandatory duty identified in the complaint is an alleged obligation on the part of DMH to conduct *in-person* examinations of all referred inmates. The Court of Appeal properly rejected this claim. The SVPA states that after an inmate is referred for a full evaluation, DMH "*shall evaluate* the person in accordance with a standardized assessment protocol" including specific risk factors. (§ 6601, subd. (c), italics added.) However, nowhere does the statute impose a *specific* requirement for in-person examination of referred inmates. As *Guzman* explained, a mandatory duty must be based on an enactment phrased in explicit and forceful language. (*Guzman*, *supra*, 46 Cal.4th at pp. 910-911.) Noncodified details of the SVP evaluation protocol are left to DMH's judgment and discretion.[8] (§ 6601, subd. (c).) Without any specific statutory command, DMH is not subject to a mandatory duty to conduct in-person evaluations of all referred inmates. (*Guzman*, at p. 910.)[9]

---

[8] Plaintiff contends that permitting DMH to merely review available records would duplicate the DOC screening mandated by section 6601, subdivision (b). Not so. Unlike the DOC screening, DMH's evaluation must be conducted by practicing psychologists and/or psychiatrists and must consider the factors identified in section 6601, subdivision (c).

[9] The complaint relies on an uncodified statute enacted in 2008, in which the Legislature stated, "The [SVP] civil commitment program requires *clinical evaluations* of potential [SVPs] for possible commitment . . . ." (Stats. 2008, ch. 601, § 1, subd. (b), pp. 4293-4294, italics added.) Even assuming that a mandatory duty could arise from an uncodified legislative declaration, and even if the 2008 legislation were relevant to our construction of the 2007 version of the

*(footnote continued on next page)*

12

As to the second element of Government Code section 815.6, there is no dispute that harm to the public caused by an SVP's release is the kind of risk the SVPA was designed to forestall.[10] The particular mandatory duty at issue here requires the designation of two evaluators. This element of redundancy built into the review process serves the interest of the inmate as well as the governmental interest in protecting public safety. However, the potential dual benefit does not

_____

*(footnote continued from previous page)*

SVPA, the reference to "clinical evaluations" is ambiguous. It is not clear whether the phrase refers to in-person assessments, or merely evaluations by practicing clinicians.

[10] An uncodified statement accompanying the SVPA's enactment in 1996 declared: "The Legislature finds and declares that a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders can be identified while they are incarcerated. These persons are not safe to be at large and if released represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence. The Legislature further finds and declares that it is in the interest of society to identify these individuals prior to the expiration of their terms of imprisonment. It is the intent of the Legislature that once identified, these individuals, if found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt, be confined and treated until such time that it can be determined that they no longer present a threat to society.

"The Legislature further finds and declares that while these individuals have been duly punished for their criminal acts, they are, if adjudicated sexually violent predators, a continuing threat to society. The continuing danger posed by these individuals and the continuing basis for their judicial commitment is a currently diagnosed mental disorder which predisposes them to engage in sexually violent criminal behavior. It is the intent of the Legislature that these individuals be committed and treated for their disorders only as long as the disorders persist and not for any punitive purposes." (Stats. 1995, ch. 763, § 1, p. 5921; see *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144, fn. 5.)

The 2006 SVPA amendments reflect enhanced concern with protection of the public from sexually violent predators. (See *McKee*, *supra*, 47 Cal.4th at p. 1186.)

defeat plaintiff's showing. We have recognized that public safety is a particularly powerful purpose of the SVPA evaluation process. (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 825; *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 912.) It is clear that the requirement of two evaluators was designed, in part, to guard against the risk that an SVP might be released.

B. *Proximate Causation*

If the first two elements set out in Government Code section 815.6 are satisfied, "the next question is whether the breach . . . was a proximate cause of the plaintiff's injury." (*Guzman*, *supra*, 46 Cal.4th at p. 898; see *Haggis*, *supra*, 22 Cal.4th at p. 499.)[11] We have recognized that proximate cause has two aspects. " 'One is *cause in fact*. An act is a cause in fact if it is a necessary antecedent of an event.' " (*Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1045 (*Ferguson*).) This is sometimes referred to as "but-for" causation. (E.g., *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 784.)[12]

The second aspect of proximate cause "focuses on public policy considerations. Because the purported [factual] causes of an event may be traced back to the dawn of humanity, the law has imposed additional 'limitations on liability other than simple causality.' [Citation.] 'These additional limitations are related not only to the degree of connection between the conduct and the injury,

---

[11] Proximate cause is also a necessary element of plaintiff's negligence claims. (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1181 et seq.; Evid. Code, § 669, subd. (a)(2) [negligence per se].)

[12] In cases where concurrent independent causes contribute to an injury, we apply the "substantial factor" test of the Restatement Second of Torts, section 423, which subsumes traditional "but for" causation. This case does not involve concurrent independent causes, so the "but for" test governs questions of factual causation. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239-1241.)

14

but also with public policy.' [Citation.] Thus, 'proximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." ' [Citation.]" (*Ferguson*, *supra*, 30 Cal.4th at p. 1045.) As Witkin puts it, "[t]he doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, the defendant will nevertheless be absolved because of the manner in which the injury occurred. . . . Rules of legal cause . . . operate to relieve the defendant whose conduct is a cause in fact of the injury, where it would be considered unjust to hold him or her legally responsible." (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1186, p. 553.)

"Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint. . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact." (*Weissich v. County of Marin* (1990) 224 Cal.App.3d 1069, 1084; see 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1184, pp. 551-552; Van Alstyne et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar 2015) § 9.38, pp. 530-530.2.)

The Court of Appeal below relied on a line of cases decided at the pleading stage. All held that proximate cause was not established when a governmental defendant's failure to act allegedly caused injury, but the chain of causation included discretionary determinations for which no liability could be imposed. First in this line is *Whitcombe v. County of Yolo* (1977) 73 Cal.App.3d 698 (*Whitcombe*). There, a probationer with severe mental disorders was arrested but released on bail. Thereafter, he assaulted and severely injured the plaintiffs. They sued the county, its probation department, and probation officers, claiming the defendants had breached a mandatory duty to investigate the incident leading to the arrest and report the probation violation to the court. (*Id.* at pp. 702-703.) A

15

demurrer was sustained for failure to state a cause of action. (*Id.* at p. 702.) The Court of Appeal affirmed, concluding the plaintiffs could not establish that the alleged breaches were the proximate cause of their injuries. (*Id.* at p. 707.)

The *Whitcombe* court noted that the grant or revocation of probation was left to the discretion of the trial court, which was not bound by a probation officer's report or recommendation, or by any particular fact in the record. "Rather, '[i]t must be guided by considerations pertaining to psychology, sociology and penology, or, in the words of the code, to "the ends of justice"; by general rules of policy which have not been and in the nature of the case should not be crystallized into positive or definite rules of law.' [Citation.]" (*Whitcombe*, *supra*, 73 Cal.App.3d at p. 708.) "In view of the latitude accorded the trial court," the claim that the failure to investigate and report the assailant's violations proximately caused the plaintiff's injuries was "specious." (*Ibid.*) Whether or not the trial court reviewed the probation reports, "the proximate cause of [the plaintiffs'] injuries would, at best, be the court's considered decision; manifestly an act immunized from liability under Government Code section 845.8, subdivision (a)."[13] (*Ibid.*)

In *State of California v. Superior Court* (1984) 150 Cal.App.3d 848 (*Perry*), the plaintiffs alleged they were defrauded by a property manager licensed by the Department of Real Estate. They sued, claiming the Real Estate Commissioner breached his mandatory duty to investigate a prior fraud complaint against the manager. (*Id.* at p. 852.) The Court of Appeal agreed with the plaintiffs that the commissioner had a mandatory duty to investigate complaints,

---

[13] As noted above, Government Code section 845.8, subdivision (a), immunizes public employees from liability for "[a]ny injury resulting from determining whether to parole or release a prisoner . . . ."

16

and that their injury was the kind the statutory mandate was intended to protect against. (*Id.* at pp. 855-856.) However, relying on *Whitcombe*, the court held the plaintiffs could not establish that the alleged breach was the proximate cause of their loss. "[E]ven had the commissioner used due care to investigate the . . . complaint, and had discovered . . . wrongdoing, there is no reasonable assurance that sanctions would have been imposed that would have prevented plaintiffs' subsequent losses." (*Id.* at p. 857.) "The commissioner's mandatory statutory duty to 'investigate' the . . . complaint may not reasonably be read as imposing a mandatory duty . . . to *take action* in the event the . . . investigation disclose[d] evidence of wrongdoing. Indeed, the Business and Professions Code specifically allows the commissioner discretion as to what action, if any, he deems appropriate to deal with transgressing licensees." (*Id.* at p. 858.)

"Moreover, he cannot act unilaterally to suspend or revoke a license; rather, suspension or revocation can occur only following a formal adjudicatory process at which accusations have to be proved by the Department of Real Estate . . . . [Citation.] In addition, had the accusations been sustained, and had the commissioner exercised his discretionary power to impose discipline [citation], that discipline could have been in the form of a license suspension for as little as 15 days [citation] — a penalty that would not have had any obvious effect on plaintiffs' losses. [¶] In short, several procedural steps lie between an initial investigation that discloses evidence of wrongdoing and any eventual imposition of effective sanctions against an offending real estate agent. The causal link is thus tenuous at best." (*Perry*, *supra*, 150 Cal.App.3d at pp. 858-859, fn. omitted.) The *Perry* court further noted that "plaintiffs' proximate cause argument leads them inexorably into immunities that insulate the commissioner from liability," because the commissioner's discretionary enforcement alternatives were statutorily immunized. (*Id.* at p. 859, fn. 8.)

17

The third case in this line of authority is *Fleming v. State of California* (1995) 34 Cal.App.4th 1378 (*Fleming*). There, a parolee committed murder. The victim's family alleged that the killer's parole officer had breached a mandatory duty to arrest him for a parole violation. The trial court sustained a demurrer. (*Id.* at pp. 1381-1382.) The Court of Appeal affirmed. It reasoned in part that "the failure to arrest [the parolee] was not in itself a cause of the injury, [because] arrest without a period of incarceration would not necessarily have prevented the crime. Incarceration, however, would have involved procedural steps involving the exercise of discretion and thus have broken the causal chain." (*Id*. at p. 1384, citing *Perry*.)

After reviewing these cases, the Court of Appeal below concluded that "the distance between defendant's alleged breach of a mandatory duty and plaintiff's injuries is too [great] to support a Government Code section 815.6 action." Even if DMH had conducted a full evaluation by appointing a second evaluator, the second evaluation would have had to disagree with the first and conclude that Pitre was an SVP; two independent evaluators would then have had to agree that he was an SVP; the designated counsel would have had to make a discretionary decision to file a civil commitment petition; and the trial court would have to have made a discretionary probable cause determination. Ultimately, the trier of fact would have had discretion to deny the petition. We agree with the court below that under the facts pleaded here, proximate cause is absent as a matter of law.

The only mandatory duty established by the complaint's allegations is the duty to use two evaluators; the details of the *manner* in which each evaluator conducts the review are discretionary, so long as they include the statutory criteria. Thus, no actionable breach of duty can be found in the single evaluator's failure to conclude that Pitre was an SVP. Nor can plaintiff hypothesize a positive finding by that evaluator as a link in the chain of proximate causation. Instead, she must

18

posit a subsequent unbroken series of discretionary findings contradicting the first evaluator's conclusion and leading to civil commitment. And as in *Perry*, none of these intermediate findings could individually have determined the outcome. (*Perry*, *supra*, 150 Cal.App.3d at pp. 858-859.) Pitre's commitment could only have occurred after a multiple-stage review process culminating in a trial and a verdict reached beyond a reasonable doubt. Plaintiff's showing of "but for" causation is weak, because with each step in the review process the results become more speculative. As explained in *Viner v. Sweet*, *supra*, 30 Cal.4th at page 1241, the purpose of the "but for" requirement is to safeguard against speculative and conjectural claims.

The policy considerations bearing on the question of proximate cause are also a considerable obstacle to plaintiff's claim. It can always be argued that governmental discretion could only have reasonably been exercised in one way. Yet such arguments turn on questions of degree, and indeed are in tension with the very idea of discretion. We do not hold that the intervention of *any* discretionary decision between breach of a mandatory duty and a subsequent injury will always foreclose a finding of proximate cause.[14] Nor do we hold that proximate cause

---

**14** The degree of discretion conferred by the governing statutes may be a relevant factor. We note that the discretion possessed by the courts in *Whitcombe*, *supra*, 73 Cal.App.3d 698, and *Fleming*, *supra*, 34 Cal.App.4th 1378, as to whether to release a probationer was considerably broader than the discretion exercised by an SVP evaluator. The Real Estate Commissioner in *Perry* also exercised a greater degree of discretion over the handling of a fraud complaint than do the various actors under the SVPA evaluation scheme. The determination whether an inmate meets the SVP criteria is guided by statutory factors and constrained by statutory procedures. Nevertheless, the SVPA review scheme clearly contemplates the possibility that evaluators may disagree, and here the only DMH evaluator to review Pitre's case found that he was *not* an SVP. Thus, the discretion in question was not so constrained as to provide support for plaintiff's claim that *any* reasonable evaluator would have found Pitre to be an SVP.

can never be established if a mandatory duty imposed by the SVPA is breached. For instance, if DMH failed to evaluate an inmate at all, or neglected to forward a request for a civil commitment after two evaluators found an inmate to be an SVP, a cause of action would not necessarily be barred simply because subsequent discretionary decisions would have been required to prevent the inmate's release.

However, the breach of duty in this case did not result in the absence of any evaluation, or the failure to act on evaluations as required by law. Plaintiff's claim, while premised on the breach of a mandatory duty, is in effect a complaint about *how the evaluation of Pitre was performed*. We note that if the review conducted by the single DMH evaluator had been performed by DOC at the previous stage of the review process, Pitre would have been released without any referral to DMH, and no cause of action would lie. Under these circumstances, as a policy matter, DMH's failure to appoint a second evaluator cannot properly be considered a proximate cause of Pitre's heinous crime. (See 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1186, p. 553; *Ferguson*, *supra*, 30 Cal.4th at p. 1045.)[15]

Accordingly, we conclude that plaintiff's showing fails under both aspects of the proximate cause determination. As a matter of cause in fact it is conjectural, depending on a long series of determinations that would have been required after DMH's breach in order for the injury to have been prevented. As a matter of policy it is problematic, because it trenches closely upon the discretionary functions of the evaluation process established by the SVPA.

---

[15] Because of our conclusion on the proximate cause issue, we do not reach the question whether the immunity conferred by Government Code section 845.8, subdivision (a) would extend to DMH's failure to employ two evaluators.

Plaintiff argues that *Whitcombe*, *Perry*, and *Fleming* are distinguishable because none of those cases involved breach of a mandatory duty. The assertion is unsupported. The *Perry* court acknowledged a mandatory duty. (*Perry*, *supra*, 150 Cal.App.3d at p. 855.) The *Whitcombe* and *Fleming* courts necessarily presumed mandatory duties for purposes of their proximate cause analyses. (*Whitcombe*, *supra*, 73 Cal.App.3d at pp. 707-708; *Fleming*, *supra*, 34 Cal.App.4th at p. 1384.) In any event, we decide the proximate cause issue against plaintiff not because the *Whitcombe* line of cases is controlling, but because the facts pleaded in this complaint are legally insufficient to connect the breach of mandatory duty with the injury.[16]

---

[16] Plaintiff's reliance on cases such as *Landeros v. Flood* (1976) 17 Cal.3d 399, *Henderson v. Newport-Mesa Unified School Dist.* (2013) 214 Cal.App.4th 478, *Alejo v. City of Alhambra* (1999) 75 Cal.App.4th 1180, and *Braman v. State of California* (1994) 28 Cal.App.4th 344, is unavailing. Plaintiff cites no case, and we have found none, in which a showing of proximate cause was founded on a series of discretionary determinations comparable to the scenario set out in her complaint.

### III. CONCLUSION

We affirm the Court of Appeal's conclusions.  The SVPA imposed a mandatory duty upon defendants to designate two evaluators to assess all persons referred by the DOC.  However, plaintiff could not establish that the alleged breach of this duty was a proximate cause of Gomez's death.  As the Court of Appeal concluded, plaintiff is free to pursue a writ of mandate requiring defendants to comply with their mandatory duties under the SVPA.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CUÉLLAR, J.**

**CONCURRING OPINION BY WERDEGAR, J.**


I concur in the court's decision affirming the Court of Appeal's judgment ordering the superior court to sustain defendants' demurrers to plaintiff's first and second causes of action. I do so, however, on narrower grounds than the majority. The majority holds plaintiff's allegations of proximate cause are both legally insufficient as to cause in fact and in contravention of public policies involving discretionary governmental decisions. (Maj. opn., *ante*, at pp. 18–22.) I agree with the first conclusion but not the second.

## I

In a typical personal injury action, where the causal relationship between the breach of duty and the injury is relatively plain, "it suffices to plead causation succinctly and generally." (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 78.) "But when, by contrast, ' "the pleaded facts of negligence and injury do not naturally give rise to an inference of causation[,] the plaintiff must plead specific facts affording an inference the one caused the others." ' [Citation.] That is, the plaintiff must allege facts, albeit as succinctly as possible, explaining how the conduct caused or contributed to the injury." (*Ibid.*)

In the present case, the causal connection between the State Department of State Hospitals's failure to employ two mental health professionals to evaluate Gilton Pitre as a potential sexually violent predator (SVP), and Pitre's subsequent rape and murder of plaintiff's sister, is by no means plainly apparent. Both for this

reason and because plaintiff's cause of action under Government Code section 815.6 is a statutory one requiring every material fact to be pleaded with particularity (*Bockrath v. Aldrich Chemical Co., supra*, 21 Cal.4th at p. 78; *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 795), plaintiff bore the burden of pleading with particularity each fact necessary to show how the agency's alleged breach caused her injury.  The rule that a demurrer admits only properly pleaded material facts, not contentions, deductions or conclusions (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6), should be applied here with plaintiff's burden of particularity in mind:  to the extent the complaint included only conclusory or inferential claims of factual causation, rather than particularized allegations of fact, it was subject to demurrer.

Viewing the complaint in this light, I agree with the majority its allegations of cause in fact were overly speculative and conjectural.  (Maj. opn., *ante*, at pp. 18-19.)  Plaintiff alleges in a conclusory manner that had the agency employed two clinicians to perform a "full evaluation," rather than a single professional to do a "paper screen[ing]," the two evaluators, on reviewing Pitre's criminal record and seeing the sadistic nature of his prior sex offense, would have determined he qualified as an SVP.  But the complaint fails to include any specific facts as to what part of Pitre's criminal record the single evaluator failed to review or what facts of the prior crime were therefore not before him.  For the crucial first step in her hypothetical causative chain, therefore, plaintiff provides only a conclusion, and a rather speculative one at that.

To the extent plaintiff was unable to learn, before filing her complaint, what criminal records were and were not reviewed by the sole evaluator, but had reason to believe identifiable critical information was omitted from his screening that would have been before the required two evaluators pursuant to the agency's "standardized assessment protocol" (Welf. & Inst. Code, § 6601, subd. (c)), she

2

could have alleged such particular critical omissions on information and belief. (See 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 398, pp. 537–538.) If plaintiff had no information and belief with regard to particular critical omissions from the screening materials, as indeed may have been the case, she lacked an adequate basis for claiming the agency's choice of a "screen[ing]" by one professional, instead of an "evaluation" by two, factually caused the agency's failure to refer Pitre to the designated county attorney for an SVP petition. (See Welf. & Inst. Code, § 6601, subd. (d).)

The complaint's deficiencies regarding the hypothetical causative chain's first step, the lack of an evaluation by two mental health professionals, are compounded by its treatment of the final step, Pitre's hypothetical commitment as an SVP. The allegation that Pitre "would have been civilly committed" is entirely conclusory, accompanied by no particularized facts to show that a unanimous jury would have determined, beyond a reasonable doubt, that Pitre was an SVP. (See Welf. & Inst. Code, §§ 6603, subd. (f), 6604.)

The complaint may be read to claim that even the *filing* of a commitment petition would have prevented the injury because most such petitions allegedly go to trial and, had a petition been filed and Pitre held for trial past his scheduled release date, "he would not have had the opportunity to murder Alyssa only four days later." But this type of coincidental causation—an allegation that some breach created an opportunity for an injury to occur, without increasing the risk of that injury occurring—is insufficient. (See Rest.3d Torts, Liability for Physical and Emotional Harm, § 30 ["An actor is not liable for harm when the tortious aspect of the actor's conduct was of a type that does not generally increase the risk of that harm."]; *Royal Indem. Co. v. Factory Mut. Ins. Co.* (Iowa 2010) 786 N.W.2d 839, 852 ["[E]ven where an act may be a factual cause, 'we are convinced that an act which merely places persons in the position where they sustain injury

3

from an unrelated event is not for that reason a legal cause of the injury.' "]; *Berry v. Sugar Notch Borough* (1899) 191 Pa. 345, 348–349 [43 A. 240] [rejecting as "sophistical" argument that streetcar motorman's speeding was the cause of his injuries when tree fell on his streetcar as it passed: although "it was the particular speed at which he was running [the streetcar] which brought the car to the place of the accident at the moment when the tree blew down[,] . . . [t]he same thing might as readily have happened to a car running slowly, or it might have been that a high speed alone would have carried him beyond the tree to a place of safety."].)[1] The risk of Pitre reoffending was no greater because he was released without a trial than had he been released after a trial ending without commitment—the exact timing of his release did not increase the public safety risk he posed. Plaintiff thus cannot establish legal cause merely by showing that absent the agency's breach of duty Pitre would not have been released in time to meet and attack the victim; she must show that absent the breach he would have been committed as an SVP. As just discussed, the complaint lacks particularized, nonconclusory factual allegations to that effect.

A plaintiff could plead factual causation in this context by alleging, on information and belief or otherwise, that through a breach of its mandatory evaluation duty the State Department of State Hospitals overlooked specific available facts regarding the potential SVP, facts so strongly indicative of mental illness and repetitive sexual predation that any decision maker would likely find

---

[1]     The Restatement Third categorizes this rule as one limiting "scope of liability," otherwise known as proximate cause, but acknowledges it can also be considered an instance of the lack of factual cause. (Rest.3d Torts, Liability for Physical and Emotional Harm, § 30, com. a, p. 542; see *id.*, ch. 6, Special Note on Proximate Cause, pp. 492–493.)

4

the person to be an SVP.  The allegations of the present complaint do not rise to that necessary level.

## II

I concur in the court's judgment on the grounds explained above.  I do not, however, agree with the majority that a finding of liability in this case would contravene "policy considerations bearing on the question of proximate cause" (maj. opn., *ante*, at p. 19) because the hypothetical causative chain on which the agency's liability depends—that two evaluators would have found Pitre to be an SVP, resulting in a referral to the designated county attorney, who would have filed a petition for commitment on which Pitre would have been held beyond his hypothetical release date and ultimately committed—involves discretionary decisions.

The majority cites no public policy stating the outcome of a discretionary decision may not form part of the chain of events a tort complaint hypothesizes as what would have happened but for the defendant's breach of duty.  *Actual* discretionary acts by public employees are protected under a public policy of preventing discretionary governmental decisions from interference or distortion through fear of liability, a policy codified in the immunity provisions  of Government Code section 820.2.  But we are concerned here only with discretionary decisions that allegedly *would have* been made, not with actual decisions.  As discussed later in this opinion, the protective policy has no logical application to merely hypothetical decisions.

The majority observes vaguely that proving causation through the outcome of discretionary decisions that would have occurred but for the defendant's breach is "in tension with the very idea of discretion." (Maj. opn., *ante*, at p. 19.)  To be sure, the existence of decisional discretion increases the plaintiff's burden on causation, a burden I agree plaintiff here has not met even at the pleading stage.

5

(See pt. I, *ante*.) But the majority cites no principle of law or public policy barring the attempt, and draws no germane factual distinction between this case and those in which such causative proof has been approved, such as *Landeros v. Flood* (1976) 17 Cal.3d 399, *Henderson v. Newport-Mesa Unified School Dist.* (2013) 214 Cal.App.4th 478, and *Alejo v. City of Alhambra* (1999) 75 Cal.App.4th 1180. To the extent the majority means to distinguish these cases on the ground that there the but-for chain involved only a single discretionary decision, while here a "series" of such decisions is hypothesized (maj. opn., *ante*, at p. 21, fn. 16), the distinction appears merely quantitative and factual, not a matter of public policy. If public policy allows a discretionary decision to form a link in the causative chain, a plaintiff with a sufficiently strong factual case—again, a case absent here—could presumably show that each link in the hypothetical chain was met.

There may be some discretionary governmental decisions so unrestricted by statutory or constitutional rules that one can say, as a matter of law, that their hypothetical outcomes could never be proven. Legislative budgeting decisions, certain sentencing choices and some conditional release determinations come to mind. But the majority makes no attempt to show the decisions involved in finding a person to be an SVP belong in this category. Indeed, the majority acknowledges these decisions are constrained by statutory factors and procedures. (Maj. opn., *ante*, at p. 19, fn. 14.) One might also note that the initial determination whether a person may be an SVP, and should be referred to the designated county attorney for a commitment petition, is made by mental health professionals using a protocol designed by and for such professionals. These are not the types of decisions whose outcomes can never be predicted.

While the majority refrains from expressly relying on the fact that the discretionary governmental decisions necessary for an SVP commitment would have enjoyed immunity under Government Code section 820.2 (discretionary acts

6

of public employees) or section 845.8, subdivision (a) (parole release determinations), the majority opinion recites with apparent approval the reasoning of two Court of Appeal decisions that employed this rationale. (Maj. opn., *ante*, at pp. 15–17; see *State of California v. Superior Court* (1984) 150 Cal.App.3d 848, 859, fn. 8; *Whitcombe v. County of Yolo* (1977) 73 Cal.App.3d 698, 708.) Neither court discussed the point in depth, however, and neither explained how a statutory immunity, or the protective policy that motivates it, can logically apply to a decision that never occurred, so as to preclude liability for breach of a mandatory duty.

How allowing causation to be traced through hypothetical decisions that did not occur would inhibit or distort real decisionmaking when it does occur is entirely unclear. To take an example from the present facts, as long as the designated county attorney knows that the decision not to seek a commitment against a potential SVP is immunized from liability, the attorney cannot be inhibited by the possibility that, in some other case that is never presented for prosecution because the State Department of State Hospitals does not make a referral, an injured plaintiff may allege the attorney *would* have sought a commitment had the decision been presented.

Neither the majority opinion nor the lower court decisions on which it relies put forward a logical ground for concluding the proof of causation in circumstances like those presented here would violate an established public policy.

7

### III

For the reasons given above, I concur in the result and in part of the majority's reasoning, but not in the majority's conclusion that policy considerations negate proximate cause as a matter of law.

**WERDEGAR, J.**

**WE CONCUR:**

**LIU, J.**
**KRUGER, J.**

8

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** State Department of State Hospitals v. Superior Court
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 220 Cal.App.4th 1503
**Rehearing Granted**


_____

**Opinion No.** S215132
**Date Filed:** June 1, 2015
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** John Segal


_____

**Counsel:**

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Chief Assistant Attorney General, Kristin G. Hogue, Assistant Attorney General, Richard F. Wolfe, Joel A. Davis, Pamela J. Holmes and Paul F. Arentz, Deputy Attorneys General, for Petitioners.

No appearance for Respondent.

Shook, Hardy & Bacon, Chris Johnson, Patrick J. Gregory, M. Kevin Underhill, Rachael M. Smith, Ashley Cornwall and Jared L. Palmer for Real Party in Interest.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul F. Arentz
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-6125

M. Kevin Underhill
Shook, Hardy & Bacon
One Montgomery, Suite 2700
San Francisco, CA 94014
(415) 544-1900